**Lloyd SHELDON et al., Plaintiffs-Appellants,**

v.

**Thomas F. O'CALLAGHAN, as President, et al., Defendant-Appellee.**

**Cal. No. 841, Docket 73-1744.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1974.

Decided May 28, 1974.

Burton H. Hall, New York City, for plaintiffs-appellants.

Marvin Schwartz, New York City, for defendant-appellee.

Before FRIENDLY and TIMBERS, Circuit Judges, and THOMSEN,* District Judge.

THOMSEN, District Judge:

Plaintiffs, members of the International Organization of Masters, Mates and Pilots, AFL–CIO (the union), brought this action in the district court against the three International officers of the union for an injunction preventing a new union constitution from becoming effective. They appeal from an

---

* Of the District of Maryland, sitting by designation.

adverse judgment entered at the close of plaintiffs' case.

Plaintiffs argued below and argue here that defendants, as officers of the union, infringed the rights of plaintiffs and other members of the union under § 101 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411, and under the old constitution of the union, (1) by not permitting separate votes on the various provisions of the new constitution, which included an increase in dues and an enlargement of the powers of the defendant officers, but requiring a single "yes" or "no" vote on the adoption of the new constitution; and (2) by publishing allegedly misleading information about the new constitution and refusing to permit plaintiffs either (a) to state their objections to the new constitution in the union newspaper, or (b) to have access to the union's mailing list or to have the list made available to a mailing service selected by defendants, so that plaintiffs could transmit their views to the other members of the union before or during the voting period.

The stipulated facts and other evidence show that before 1968 the union consisted of largely autonomous local unions, although its collective bargaining agreements were negotiated on an industry-wide basis. In response to suggestions to eliminate the local unions and consolidate their powers and responsibilities into divisions which corresponded to the bargaining patterns in the industry (i. e., offshore, inland, governmental employees and pilots), plaintiff Sheldon, who was then International President, appointed a Constitutional Advisory Committee.[1] That committee prepared proposals for restructuring the union, including a proposal to consolidate the local unions into divisions. Those proposals were published in the March 1968 issue of the union newspaper, which is mailed to each member's home address, to the ships on which members are employed, to each local union, and to recreation centers overseas.

The committee's proposals were put before the International convention held in May 1968. The convention decided to hold an advisory referendum of the entire membership on the issue of restructuring the union through consolidation of locals into divisions. The advisory referendum approved the principle of restructuring and consolidation by a vote of about five to two.

In December 1968 the International Executive Board voted to convene a special constitutional convention to be held in September 1969. The result of the advisory referendum and the decision to convene a constitutional convention were reported in the January 1969 issue of the union newspaper. The constitutional convention met in September 1969. It proposed certain constitutional amendments and a description of a proposed structure for an Offshore Division and other divisions. These proposals were published in the October 1969 issue of the union newspaper.

The convention reconvened on January 26, 1970, to consider a draft of a proposed new constitution, which contained a variety of amendments to the then-existing constitution. It "consolidated" all local unions of the sea-going members, who comprise some 8,000 of the union's total membership of 10,000, into a nationwide Offshore Division, and created other nation-wide divisions for non-seagoing members. It changed the union's dues structure in various ways and increased the rates of dues payable by more than half of the union's members. It raised the salaries of the two top International officers, and provided for a new, $35,000 salary for a third, previously unsalaried International officer. It greatly increased the power of the three International officers by providing that those three officers were to become the three top officers of each division, including the Offshore Division, and by

---

1. Sheldon was thereafter defeated in his bid for reelection by the current President, defendant Thomas F. O'Callaghan.

virtue of being the three top officers of the Offshore Division would be able to cast one-half of the weighted vote of the Offshore Division on the General Executive Board of the union.

The pre-existing constitution provided that it might be amended by a two-step procedure: approval at a convention and, thereafter, approval by the membership in a referendum.

At the session of the constitutional convention on January 31, 1970, a delegate raised a point of information as to whether the separate provisions of the "new" constitution would be voted upon seriatim or separately; the Chairman (defendant O'Callaghan, the International President) ruled that the entire document would be voted upon as a single package. The proposed constitution was put to a vote at the convention and was approved by a more than two-thirds vote.

During the convention, the International President announced that a committee composed of the executive officers (or their designees) of each offshore local would meet after the close of the convention for the preparation of Offshore Division by-laws. After the convention had dissolved, that committee met and drafted a set of by-laws for the Offshore Division.

During February 1970 a copy of the proposed constitution was sent to the executive officer of each local union and a mimeographed copy of the proposed Offshore Division by-laws was sent to the executive officer of each offshore local. The referendum was to be conducted by mail, over a three month period beginning in March 1970 and ending in June 1970. All members were to vote on the adoption of the proposed constitution; all offshore members were to vote on the adoption of the proposed Offshore Division by-laws.

One of the provisions of the proposed constitution was widely publicized by defendants before and during the referendum; that was the provision which would consolidate all sea-going local unions into one division—a popular proposal.

On February 23, 1970, the three International officers sent a letter to each member of the union summarizing what they described as the "high points" of the proposed constitution and urging its adoption.[2] The March 9, 1970 issue of the union newspaper published the text of the proposed new constitution in full, and reprinted the February 23 letter of the International officers.

Shortly after receiving the February 23 letter plaintiffs, individually and as members of a committee elected by Local 88 to oppose the new constitution, asked for an opportunity to express their views to the membership of the union, either by space in the union newspaper, by use of the union's mailing list, or through an independent mailing service designated by the International office, at the cost of the plaintiffs. Their requests were ignored or denied. On the other hand, defendants repeatedly pub-

---

2. The letter referred not only to the consolidation of local unions, but to at least seventeen other provisions in the new constitution. These included such matters as "Closing of membership rolls until a reasonable membership/job relationship exists", liberalization of qualification for elective office, annual conventions, reduction in terms of elective office, disciplinary procedural changes, recall of officers, and obtaining a national pension and welfare plan. On the question of a dues increase, the letter stated: "The dues for the Offshore Division calls for an increase. Inland dues remain the same. For the past several years the initiation fees have paid over thirty-five percent of the International expenses. Income from initiations will cease until the membership/job ratio is realized. The necessity of a dues increase is obvious."

Neither the letter of February 23 nor any other letter to the membership nor any issue of the union newspaper contained any discussion of the proposal to make the three International officers automatically the three top officers of all divisions, or of the proposal to give the three International officers half the weighted vote on the General Executive Board of the Offshore Division. Nor did the union, or any of its officers, publish any statement or article by any opponent of the proposed constitution.

lished material favoring the new constitution. In addition to reprinting the February 23 letter on the back page of the March 1970 issue of the union newspaper, the International officers published, in the two issues of the paper which appeared during the referendum period, a substantial amount of material advocating approval.

A ballot containing spaces for a "yes" or "no" vote on the proposed new constitution was sent to each member of the union, together with a booklet containing the text of the proposed constitution. Each offshore member also received a second booklet, containing the text of the proposed Offshore Division by-laws, on which their ballots called for "yes" or "no" votes.

The ballots were counted in June 1970. The new constitution was approved by a vote of 2,781 for and 2,602 against; the Offshore Division by-laws were approved by a vote of 2,206 for and 2,113 against. The new constitution and Offshore Division by-laws went into effect after plaintiffs filed this action.

(1) Plaintiffs' first argument is that the defendants infringed their rights and the rights of other members of the union under § 101(a)(1) and (3) of the LMRDA, 29 U.S.C. § 411(a)(1) and (3),[3] and under the old constitution, by not permitting separate votes on the various provisions of the new constitution; particularly, they object to not having been able to vote on the dues increase and the enlarged powers of the International officers separately from the consolidation of the local unions, which plaintiffs and most union members favored.

■ Plaintiffs rely on Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Cos., C. D. C., 423 F.2d 515 (6 Cir. 1970), where the court held that a referendum that resulted in an increase in dues, in which the ballot gave a member no opportunity to vote against such increase without also voting against negotiations for a wage increase, was a violation of the LMRDA. The Sixth Circuit stated that free participation in union government "necessarily would include the right to vote 'yes' or 'no' on increases of dues or assessments without coercion. * * * Union members are entitled under the Act to the right of a meaningful vote on increases in dues or assessments". (p. 521). We do not disagree with the principles stated in Sertic, but we conclude that those principles did not require the union in the instant case to submit for a separate vote each of the many interrelated provisions of the proposed new constitution. The adoption of some of those provisions and the rejection of others might have resulted in an unworkable document, and thrown the operation of the union into confusion.[4]

3. § 101(a)(1) provides: "*Equal rights.*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws."

§ 101(a)(3) provides that dues shall not be increased except:
"* * *

"(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization."

4. The district court found: "The Union, and particularly the Convention delegates responsible for drafting the new Constitution

■ Nor is there any merit in plaintiffs' contention that the old constitution required a separate vote on the various provisions of the proposed new constitution which differed from the provisions of the old.

(2) Plaintiffs also argue that defendants deprived them of their rights under § 101(a)(1) of LMRDA, 29 U.S.C. 411(a)(1), and under the old constitution of the union, by publishing misleading information about the new constitution and refusing plaintiffs' repeated requests for permission either to state their objections to the new constitution in the union newspaper, or to have access to the union's mailing list, or to have the list made available to a mailing service selected by defendants, so that plaintiffs could transmit their views to the other members of the union before or during the voting period.

The purpose of the LMRDA was stated by Chief Judge Lumbard in Navarro v. Gannon, 385 F.2d 512, 518 (2 Cir. 1967), as follows:

"The LMRDA was enacted with the clear purpose of assuring 'the full and active participation by the rank and file in the affairs of the union.' American Federation of Musicians v. Wittstein, 379 U.S. 171, 182–183, 85 S.Ct. 300, 307, 13 L.Ed.2d 214 (1964). The Congress by passing a 'Bill of Rights' for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as

fundamental values in the labor movement."

In Schuchardt v. Millwrights & Mach. Erectors Loc. U. No. 2834, 380 F.2d 795, 797 (10 Cir. 1967), the court said: "The basic purpose of the 'bill of rights' * * * is to assure to union members a basically democratic union organization with the concomitant protections against arbitrary and despotic control by union leaders." As Professor Cox put it: "An individual worker gains no human rights by substituting an autocratic union officialdom for the tyranny of the boss. Only a democratic union, sensitive to the rights of minorities, can help men to achieve the ideals of individual responsibility, equality of opportunity, and self-determination." [5]

On the other hand, the provisions of the LMRDA were not intended to constitute an open invitation to the courts to intervene in the internal affairs of a union. See Gurton v. Arons, 339 F.2d 371, 375 (2 Cir. 1964).

Former Representative, now Senator Griffin recently wrote: "Congress sought to strike a balance between rights for individual members and the recognized institutional requiements necessary for a union to be an effective bargaining force." [6]

■ This court recognizes the need to exercise what Judge Wisdom referred to as a "sound reluctance * * * to interfere in internal union affairs". Allen v. International Alliance of Theatrical, etc., 338 F.2d 309, 317 (5 Cir. 1964). However, the court also recognizes its duty to protect the fundamental rights of individual members against "arbitrary and despotic control by union leaders". Schuchardt v. Millwrights & Mach. Erectors Loc. U. No. 2834, supra.

■ Plaintiffs complain because defendant officers emphasized popular fea-

---

to be submitted to the membership, could reasonably have concluded that the dues increase for offshore members was related to the restructuring and consolidation of the Union provided for in the new Constitution, including the limitation on new members."

5. Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 610 (1959).

6. Griffin, The Landrum-Griffin Act: Twelve Years of Experience in Protecting Employee Rights, 5 Ga. Law Rev. 622 (1971).

tures of the proposed constitution while ignoring or playing down other features which would have been unpopular with many of the members.[7]  The duly elected officers of a union have a right and a responsibility to lead, and to give the members the benefit of their advice on questions that arise.  They have a right to use the union publications to express their views, and are not ordinarily required to give space therein to the expression of contrary views, provided they do not interfere improperly with whatever rights members may have to communicate their views to other members.

The new constitution contains a provision that:

"h) Every member shall have the right to:

"1) Circulate petitions on union policy.

"2) Publish and distribute leaflets, newspapers and all other written material or present his opinions through other media.  *  *  *"

The old constitution contained no similar provision, but that does not end the matter.

■  The old constitution provided for a referendum in which all members in good standing were eligible to vote. The International officers had a duty under the LMRDA to conduct a fair referendum, and that obligation should be enforced by the courts.  No special expertise in union affairs is required; for more than a hundred years courts have been dealing with similar rights of members of unincorporated associations. See Chaffee, The Internal Affairs of Associations Not for Profit, 43 Harv.L. Rev. 993 (1930); Developments in the

Law:  Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 985 (1963).

The majority rule concept is at the center of our federal labor policy.  Because of that policy the Supreme Court has found it necessary to fashion the duty of fair representation.  For the same reason Congress enacted a code of fairness to assure democratic conduct of union affairs.  NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

A fair referendum under the facts of this case included the right of members whose views were opposed to defendants' to have an opportunity to present their views to other members of the union. This was particularly true in the case of plaintiffs, who were members of a committee appointed by a large local to present the views of that local to other members of the union.

■  We do not hold that defendants were required to give plaintiffs space in the union newspaper to present their views.  Whether plaintiffs were entitled to a list of the membership is a more troublesome question, since there are reasons why a union may not wish to take the risk of its membership list falling into the wrong hands.[8]  It is not necessary to decide that question in this case, because plaintiffs made an alternative proposition, namely, to pay the expenses of having their views sent to the other members of the union through a mailing service selected by defendants.

We conclude that, on the evidence as it stood at the time defendants' motion to dismiss was granted, the LMRDA, interpreted in the light of established legal principles, required defendants to

7.  Plaintiffs also sent copies of the proposed constitution to all members and copies of the proposed Offshore Division by-laws to all offshore members.  The union was composed of persons who were sufficiently well educated to serve as masters, mates and pilots, and who presumably could read and understand those documents.

8.  The California courts have held that apart from the LMRDA, the members of a union

have a right to inspect the union's books and records for a proper purpose, and one California court has indicated that this rule applies to lists of members.  See Mooney v. Bartenders Union Local No. 284, 48 Cal.2d 841, 313 P.2d 857, 64 A.L.R.2d 1154 (1957); Hod Carriers Local 89 v. Young, 42 L.C. 61,641 (Cal.Super.Ct., San Diego, 1961). Labor's Bill of Rights was not intended to narrow the rights of union members.

make the list of members of the union available to a mailing service chosen by defendants so that plaintiffs could send a letter to all members expressing their views and the view of their local on the issues involved in the referendum.[9]

Defendants state, however, that if their motion to dismiss had not been granted, they would have presented evidence that a newspaper published by plaintiffs' local union was widely distributed among the union membership, and that plaintiffs' views were in fact being disseminated.

The judgment must be reversed, and the case remanded for further proceedings consistent with this opinion.

---

9. Neither Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), nor Robins v. Rarback, 325 F.2d 929 (2 Cir. 1963), cert. denied, 379 U.S. 974, 85 S.Ct. 670, 13 L.Ed.2d 565 (1965), is directly applicable to this case, since they involved union elections rather than referendums. Title IV of the LMRDA provides detailed procedural safeguards for union elections, and the *Calhoon* Court held that the exclusive remedy for protecting those election rights was through a post-election suit by the Secretary of Labor. Of course, those cases and Gur- ton v. Arons, 339 F.2d 371 (2 Cir. 1964), a referendum case, strongly suggest that courts should be reluctant to interfere with internal union affairs absent specific statutory license. In this case, however, the defendant union officials' stiff-necked refusal even to provide their opponents access to the membership mailing list rendered the referendum procedure so patently unfair that their conduct can fairly be deemed "a denial of the [members'] equal right to vote in elections or referendums," Gurton v. Arons, supra, 339 F.2d at 374.