**MEMBERS FOR A BETTER UNION, Carlos Guzman, Dominick Bentivenga, and Frank Colon, Plaintiffs,**

**v.**

**Gus BEVONA, as President of Local 32B–32J, Service Employees International Union, AFL–CIO, Defendant.**

No. 97 Civ. 0980 (RO).

United States District Court, S.D. New York.

Aug. 1, 1997.

---

Kennedy, Schwartz & Cure, P.C., Arthur Z. Schwartz, for Plaintiffs.

Spivak, Lipton, Watanabe, Spivak & Moss, Franklin K. Moss, Eric Greene, Rochman, Platzer, Fallick & Sternheim, Irwin Rochman, for Defendant.

*OPINION AND ORDER*

OWEN, District Judge.

Plaintiff Members for a Better Union ("MBU") is a caucus consisting entirely of members of Local 3'2B–32J ("Local 32B" or "the Local") of the Service Employees Inter-

national Union ("SEIU") who are opposed to the policies of the incumbent leadership of the Local. Individual plaintiffs Carlos Guzman, Dominick Bentivenga, and Frank Colon are members of the Local and MBU. Carlos Guzman was MBU's candidate for President of Local 32B in 1992 and 1995. Defendant Gus Bevona is the current President of Local 32B, which represents approximately 70,000 building service employees working all shifts 24 hours every day in commercial office and residential buildings in the five boroughs of New York City, in Nassau and Suffolk counties and in northern New Jersey. Local 32B is governed by its own constitution as well as that of SEIU. In November 1996 plaintiffs submitted a series of proposed amendments to the Local 32B constitution for approval by the Local membership. A vote on the proposals was held on February 19, 1997.

On March 18, 1997, plaintiffs filed an amended complaint for declaratory and injunctive relief alleging that the said February 19 vote on the proposed constitutional amendments 1) was conducted in a time and manner which deprived 20% or more of the membership of their right to vote, violating § 101(a)(1) of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1);[1] 2) was conducted in a biased, unfair and intimidating manner in violation of LMRDA § 101(a)(1); and 3) the members were not given sufficient information in advance of the vote in violation of LMRDA § 101(a)(1) and (2).[2] Defendant moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).

The current litigation is the latest in a long-standing bitter conflict between Local 32B president Gus Bevona and dissident Carlos Guzman and MBU. In *Guzman v. Local*

---

1. LMRDA § 101(a)(1) states in relevant part:
   Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

2. LMRDA § 101(a)(2) states in relevant part:

Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings.

*32B–32J*, 151 LRRM 2006, 1995 WL 562187 (S.D.N.Y.1995), the court ruled that Local 32B–32J violated LMRDA 29 U.S.C. § 481(c) by distributing the incumbents slate's pre-election campaign material at union expense and by refusing to provide Guzman with equal access to distribution, and ordered that the Local distribute Guzman's literature as well. *Id.* at 2008. In *Guzman v. Bevona*, 90 F.3d 641, 644 (2d Cir.1996), the Court of Appeals for the Second Circuit affirmed a jury award in favor of Guzman who had sued Bevona and other Local officials after discovering that both he and his wife had been placed under surveillance by Bevona to determine whether Guzman's criticism of the union and the union leadership had been fueled by anti-union management. The jury awarded Guzman $100,000 for impairment of his free speech rights and the court ordered all defendants to repay the union treasury the $19,343 expended for the surveillance and additionally ordered that all surveillance cease. The Court of Appeals noted in that case that in June 1995, two months before the trial, Guzman was assaulted by several shop stewards and that the union took no disciplinary action against them. *Id.* at 645.

Plaintiffs first came before me on February 14, 1997 seeking a preliminary injunction staying the proposed February 19 vote on plaintiffs' proposed constitutional amendments which had been scheduled to take place during two separate meetings at 2 p.m. and 6 p.m. Plaintiffs claimed that the limited voting hours denied 20% of the membership an opportunity to vote because of the members' work shifts. I declined to stay the meeting but, based on the plaintiffs' showing that a meaningful number of the membership would be disenfranchised, I ordered that the vote be held continuously from 2 p.m. to 9 p.m. and that Local 32B "to the greatest degree possible post notices in all building services by its members advising them of the change in hours of the vote." *See Jiminez v. Briody*, 134 LRRM 3119, 3121–22, 1990 WL 300323 (S.D.N.Y.1990).

While the vote on the proposed amendments took place on February 19, 1997, plaintiffs, in Count I, claim that Local 32B failed to notify thousands of Local 32B members of the court-ordered extended hours. They also claim that even with the extended hours ordered by the court, the location of the vote and the scheduling of the vote at a time when a large percentage of members were working, deprived approximately 20% of the members of an opportunity to vote, violating LMRDA § 101(a)(1).

Plaintiffs allege in Count III that the vote was tainted by a series of intentional actions taken by the leadership of Local 32B on the day of the vote, which actions were a part of "a continuing effort to stifle and chill the exercise of democratic and free speech rights by the members of Local 32B." Plaintiffs state the following in their complaint:

a) The ballot stated at the top: "THE JOINT EXECUTIVE BOARD HAS UNANIMOUSLY REJECTED THEM [the proposed amendments] AND RECOMMENDS THAT YOU VOTE NO."

b) Members were not provided with private space to mark what was supposed to be a secret ballot.

c) Business agents, delegates and union officers roamed around the area where members were attempting to secretly mark their ballots.

d) Union officers, delegates, and employees electioneered throughout the voting area.

e) Delegates and officers registering members and handing out ballots wore "Vote No" stickers.

f) Insufficient space and personnel were provided during peak periods for registration and voting, resulting in disorderly, long lines which discouraged members from voting.

g) Ballot boxes were moved out of the voting area and were left unattended.

h) The ballot was put together in such a way as to make it difficult for the members to understand what they were voting on.

Plaintiffs claim that such actions so tainted the vote that it was "run in violation of the member's and plaintiffs' right to an equal vote" in violation of LMRDA § 101(a)(1). Plaintiffs further assert that said actions "will also serve to discourage members from exercising their rights to vote in the future."

Finally, in Count II of their amended complaint, plaintiffs claim that the members of the Local were asked to vote without being given sufficient information in advance of the vote. Plaintiffs premise their claim on the fact that the union leadership refused to publish the proposed amendments in the Local 32B newspaper, despite the fact that when the last vote on constitutional amendments took place in 1992, the text of the proposals along with an article by their proponents appeared in that publication. Plaintiffs claim that the Local sent out an announcement and copy of the proposals to "some, but not all" of the members, which announcement stated that the Executive Board recommended a negative vote. The text distributed stated that the proposals had been made by "three members" of the Local but failed to identify them as members of MBU. The announcement of the actual vote sent out in February 1997 repeated the Executive Board's negative recommendation but did not set forth a basis for that recommendation.

Following that mailing, plaintiffs demanded an opportunity, at union expense, to respond. That request was denied on the grounds that the recommendation of a "No" vote was an official position of the union. Plaintiffs claim that by failing to publish plaintiffs' proposals in the Local 32B newspaper before the February vote, by twice publishing a negative recommendation by the Local Executive Board without explanation, and by failing to provide plaintiffs with an opportunity to respond at union expense, the rights of the members to an informed vote was denied in violation of LMRDA § 101(a)(1) and (2).

Defendant moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' complaint in its entirety, claiming that 1) the complaint does not state a cause of action under the LMRDA and 2) neither MBU nor the individual plaintiffs have standing under the LMRDA. For purposes of a 12(b)(6) motion, I must construe the complaint in the light most favorable to the plaintiff, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and in order for the defendant to prevail, it must appear that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Defendant contends that the limited hours of the February 19 vote, the form of the ballot used in the referendum (exhorting the membership to vote "No" to the proposed amendments), and the other alleged election irregularities contained in Counts I and III of plaintiffs' amended complaint do not constitute a cause of action under the LMRDA and are beyond the scope of judicial intervention.

The purpose of the LMRDA is to guarantee the "full and active participation by the rank and file in the affairs of the union." *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 182–82, 85 S.Ct. 300, 306, 13 L.Ed.2d 214 (1964). Title I of the LMRDA is referred to as the "Bill of Rights of Members of Labor Organizations" and § 101(a)(1) provides for the equal rights of union members to vote in elections or referendums. 29 U.S.C. § 411(a)(1) and (2).

> The Congress, by passing a 'Bill of Rights' for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy.

*Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir.1967) cert. den. 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968).

Defendant relies on *Gurton v. Arons,* 339 F.2d 371 (2d Cir.1964) to support his contention that plaintiffs' allegations are beyond the scope of judicial intervention:

> The provisions of the LMRDA were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions. Courts have no special expertise in the operation of unions which would justify a broad power to interfere.

*Id.* at 375. In that case, the court was responding to plaintiffs' request that the court rule on whether (union) by-laws were

lawfully repealed—a matter clearly not contemplated by § 101(a)(1) of the LMRDA.

In this case, however, the court is being asked to intervene to assure the members an equal right to vote which is specifically enumerated in § 101(a)(1). In *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1281 (2d Cir.1974), a case involving a similar referendum on constitutional amendments, the court while recognizing the importance of "a sound reluctance" to interfere in the internal affairs of unions, also recognized the court's duty to protect the rights afforded to union members under the LMRDA. The court went on to describe both the duty of the union officials conducting the referendum and the responsibility of the court, stating:

"The [union] officers had a duty under the LMRDA to conduct a fair referendum, and that obligation should be enforced by the courts. No special expertise in union affairs is required; for more than a hundred years the courts have been dealing with similar rights of members of unincorporated associations."

*Id.* at 1282 (citations omitted).

In *Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d 1117, 1121–22 (D.C.Cir.1977), the court stated that the equal right to vote protected by LMRDA § 101(a)(1) is more that "the mere naked right to cast a ballot" and that "[e]vidently the equal right to vote may be denied upon the occurrence of serious discrimination, irregularities, or foul play at any stage of the electoral process." A fair referendum assuring the equal right to vote under § 101(a)(1) includes the right of members to have the vote scheduled at a time when they can exercise their vote and the right to be free from intimidation or fear of reprisal from union officials—and the courts in this circuit have not been reluctant to act when faced with the responsibility for vindicating such rights.

In *Jiminez v. Briody*, 134 LRRM at 3122, the court, pursuant to LMRDA § 101(a)(1), ordered a new date and extended hours from 9 a.m. to 10 p.m. for a referendum on union bylaws because approximately 10% of the membership would have been disenfranchised if the vote were scheduled as the local

union had arranged. In *Navarro*, a case which involved the threatened supervision of a local union's meeting by representatives of a parent labor organization, the court held that "the guaranty in Section 101(a)(1) of the equal right to participate in the deliberations and voting at union meetings ... necessarily encompasse[s] the right to assemble, consult, and decide matters of concern to the local union without the inhibiting presence and control by international officials." 385 F.2d at 518. Furthermore, in *Fight Back Committee v. Gallagher*, 120 LRRM 2372, 2375–76 (S.D.N.Y.1985), the court intervened in a union vote where the union officials published an intimidating leaflet, used a video camera at the vote, and employed over 525 sergeants-at-arms at a union meeting.

Defendant does cite cases which stand for the proposition that the courts will not intervene in the actual wording of the ballots. In *Jiminez*, 134 LRRM at 3122–23, the court refused to intervene in the formulation of the ballots and how they were drawn up. In *Soto v. Int'l Org'n of Masters, Mates, & Pilots*, 466 F.Supp. 1294, 1300 (S.D.N.Y. 1979), the court held that union officers may use the power of their office to print ballots which are designed to advance their agenda, even if the ballots are somewhat misleading or involve "political trickiness."

In those cases, however, there were no allegations of possible intimidation along with the alleged balloting irregularities. Here, for the purposes of this motion, I must not only credit the allegation that the ballot clearly exhorted the voters to vote "No", but I must also accept as true the other allegations of improper behavior contained in the complaint—including claims that union officials wearing "Vote No" stickers maintained a formidable presence in a voting area where no provisions were made for any private place to mark the ballot to the contrary if so desired. Accordingly, considering the referendum allegations contained in Counts I and III of plaintiffs' amended complaint as a whole, I find that plaintiffs have stated a cognizable claim under LMRDA § 101(a)(1) and thus defendant's motion to dismiss is

denied as to Counts I and III.[3]

■ Tuning to Count II, the plaintiffs allege that the Local's failure to publish plaintiffs' proposals in the Local 32B newspaper, their twice publishing a negative recommendation by the Local Executive Board without explanation, and their failure to provide plaintiffs with an opportunity to respond at the Local's expense,[4] constitute violations of Section 101(a)(1) and (2) of the LMRDA.

In *Sheldon,* the Second Circuit held that union officers did not violate the LMRDA by refusing to publish the views of union dissidents on constitutional amendments in the union newspaper. 497 F.2d at 1282.

> [The duly elected officers of a union] have a right to use the union publications to express their views, and are not ordinarily required to give space therein to the expression of contrary views, providing they do not interfere improperly with whatever rights members may have to communicate their views to other members. . . . We do not hold that defendants were required to give plaintiff's space in the union newspaper to present their views.

*Id.* The D.C. District Court ruled similarly in *Durham v. Carey,* 145 LRRM 2946, 2947, 1994 WL 121122 (D.D.C.1994)(union officers' failure to pay for dissemination of dissidents' views opposing certain constitutional amendments, while simultaneously publishing its own view in union newspaper did not violate LMRDA). In contrast, the Sixth Circuit in *Knox County Local, National Rural Letter Carriers' Association v. National Rural Letter Carriers' Association,* 720 F.2d 936 (6th Cir.1984), held, on First Amendments grounds that where the union newsletter was the most economically feasible means of communicating with the members, the union may be ordered to publish the views of the dissi-

dents in a paid advertisement in the newsletter.

Plaintiffs argue that *Knox* applies to their situation as dissidents in a large union where the union newspaper is the only reasonable way to communicate with the membership. There, however, the union refused to publish a *paid advertisement* for which the local union submitted a $460.00 payment. The court found that the union's content-based refusal to permit access to its open forum newspaper was a restriction on the dissidents' rights. In this case there has been no payment or offer to pay for any advertisement. Plaintiffs rather are claiming that the union both failed to publish their views in the Local newspaper and failed to provide them with an opportunity to respond to the membership *at the Local's expense.*

Plaintiffs also rely on *Sheldon* to support their claim. In that case, the court, under LMRDA § 101(a)(1), did uphold the dissidents' right to access to the union *mailing list* (not the newspaper) to express their views but in that case the ruling was expressly based on the fact that the dissidents offered to pay for the distribution of its own mailings. Accordingly, I conclude that, unlike Counts I and III, Count II of plaintiffs' amended complaint does not state a cause of action under LMRDA § 101(a)(1) and (2) and is therefore dismissed.

■ The only remaining issue is the standing of both the individually named plaintiffs, and MBU as a caucus, to bring the claims contained in Count I and Count III. Defendant contends that the individual plaintiffs have no standing to assert the claims of voting and balloting irregularities contained in Count III of their complaint because the complaint does not allege that any of the individual plaintiffs were personally disen-

---

3. Defendant contends that it is incorrect for plaintiffs in their complaint to continue to seek that future votes be held continuously from 6 a.m. to 9 p.m. because this court, by extending the voting hours from only 2 p.m. to 9 p.m. in the February session, therefore ruled that a voting schedule of 6 a.m. to 9 p.m. "exceeds what a court may be lawfully authorized to direct under the LMRDA." I made no such finding at the hearing on February 14, 1997 and the issue is properly before me.

4. Plaintiffs state in their brief that they are not claiming statutory entitlement to a union-financed mailing of their views. Rather they contend that defendant's violations of the LMRDA as discussed above made a Local-financed dissemination of their views necessary to ensure that the vote was "fair and meaningful."

franchised by the alleged conduct and a union member may only sue a union to vindicate his or her own rights and not to enforce the rights of other union members. However, where intimidation is fairly alleged, as it is here, it is not an answer to in effect say that the plaintiffs have no standing to assert the claim of intimidation affecting the integrity of the voting process as to all because they themselves proceeded in spite of it.

Furthermore, § 102 of the LMRDA, 29 U.S.C. § 412, permits any *person* whose rights have been infringed by any violation of Title I to bring a civil action for appropriate relief under the statute. Guzman, Bentivenga, and Colon as voting members of the Local, have an obvious stake in the outcome of any vote and any alleged voting irregularities (which must be credited as true in a 12(b)(6) motion), affect any outcome and therefore work a violation of LMRDA § 101(a)(1), directly affecting the rights of all individual members. Accordingly, the individual plaintiffs have standing to assert these overall voting rights claims.

■ As to MBU's standing, defendant cites *Negrin v. Short*, 152 LRRM 2535, 2546, 1996 WL 349166 (S.D.N.Y.1996) in which the court, citing cases from the Sixth and Ninth circuits,[5] held that only *individual members*—not local unions have standing to make a claim under § 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4). The rationale of both circuits for refusing a local union standing is that § 411 is intended to protect the rights of individual rank and file members and not union sub-units. The *Negrin* court also noted that § 41(a)(4) specifically protects the "right of any *member*." (emphasis added). While that case refers to LMRDA § 101(a)(4), the wording of LMRDA § 101(a)(1), which is being litigated in this case, is similar in that it protects the rights of "every *member* of any labor organization." (emphasis added).

Plaintiffs assert, nevertheless, that MBU does have standing because, as stated above, LMRDA § 102, 29 U.S.C. § 412, permits any

*person* whose rights have been violated to bring an action. The word "person" is defined at 29 U.S.C. § 402(d) as "one or more individuals, labor organizations ... associations [or] ... unincorporated organizations." Plaintiffs therefore contend that MBU is a "person" within the meaning of the statute. However, I decline to so interpret and apply the statute here because even if MBU could be considered a "person" under the statute for some purposes, it, as a caucus, has no right to cast a vote in a union referendum, and therefore its rights have not been infringed by the alleged misdeeds asserted in Count I and Count III of the complaint which specifically relate to voting irregularities.

Accordingly, only the individual plaintiffs, and not MBU, have standing to assert claims under Count I and Count III of the amended complaint, and therefore, although of no material impact on the progress of this action, MBU is stricken as a plaintiff herein.

The parties are to appear before me for a conference on September 5, 1997 at 2:30 P.M. in Courtroom 1106.

The foregoing is so ordered.