166 F.3d 465
 160 L.R.R.M. (BNA) 2336
 Walter R. SIM; Daniel F. Dougherty; Eugene R. Sim; Joseph
P. Evans; John Shearer; John P. Hoare; William Stenger;
Paul Wolff; Jim B. Clark; Anthony Passaro; John J.
Cronin; Louis V. Iavarone; John T. Curran; Steve Lima;
Frank Delucia; Richard Rettagliata; Edgar Gonzalez; Dan
Taylor; Jean J. Barthelemy; Abe Wecker; Eugene Tesoriero;
Vincent Pietrofesa; Kenneth Goodheart; Tyrone Carroll;
Carl Scala; Larry Calabrese; Eugene Basile; Frank
Lambert; Lenny Abramowitz; Judson Pewther; Philip T.
Coyle; Joseph F. Shea; Sam Citron; James Bloecker;
Orazio Bombara; Marcelino Gonzalez; Bruce Faulkner; Barry
Abramowitz; John Bernardinello; J.W. Allen; John Shea;
Neil Peltzman; Stuart Glick; John Zupanic; Richard
Smollon, Plaintiffs-Appellants,
v.
NEW YORK MAILERS' UNION NUMBER 6 and George E. McDonald,
individually and as President, Wayne Mitchell, individually
and as Business Representative of New York Mailers' Union
Number 6; New York Times Company, Defendants-Appellees.
 Docket No. 98-7563.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 23, 1998.
Decided Jan. 28, 1999.
 
 Arlene F. Boop, Daniel L. Alterman, Nina Koenigsberg, Alterman & Boop, P.C., New York City, for Plaintiffs-Appellants.
 Richard Rosenblatt, Boyle, Tyburski & Rosenblatt, New York City (Andrew S. Hoffmann, Wiseman, Hoffman & Walzer, New York City, on the brief), for Defendants-Appellees New York Mailers' Union, George McDonald and Wayne Mitchell.
 Bernard M. Plum, Michael H. Roffer, John F. Fullerton III, Robert H. Cohen, Proskauer Rose LLP, New York City, for Defendant-Appellee The New York Times Co.
 Before: OAKES, WALKER, and McLAUGHLIN, Circuit Judges.
 JOHN M. WALKER, Jr., Circuit Judge:
 
 
 1
 Plaintiffs appeal from an order of the United States District Court for the Southern District of New York (Harold Baer, Jr., District Judge ) granting defendants' motion for summary judgment, denying plaintiffs' cross-motion for partial summary judgment and dismissing plaintiffs' complaint in its entirety. Plaintiffs, who are forty-five members of New York Mailers' Union Number 6 (the "Union"), brought claims alleging that the Union, its President, George McDonald, and its Business Representative, Wayne Mitchell, (collectively, the "Union Defendants"), in their successful effort to conduct a ratification vote by the Union's membership on a proposed modification of its collective bargaining agreement with the New York Times Company ("Times" or "New York Times"), (1) breached the Union's bylaws, (2) violated Section 101(a)(1) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1), and (3) breached the Union's duty of fair representation. Plaintiffs further allege that the Times unlawfully colluded with the Union and thereby caused the breach of the Union's duty of fair representation. We affirm in part, vacate in part and remand for the district court to dismiss plaintiffs' LMRDA claim for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1).
 
 I. BACKGROUND
 
 2
 The following facts are undisputed. The New York Mailers' Union Number 6 represents mailroom employees, including plaintiffs, at the Times's production facilities in New York and New Jersey. In 1996, there were approximately 420 members in the bargaining unit, known as a "chapel". Plaintiffs are forty-five chapel members who worked at the Times in 1996. All but two plaintiffs remain at the Times.[1]
 
 
 3
 The Union and the Times are parties to a collective bargaining agreement ("CBA") embodied in a Memorandum of Agreement dated August 22, 1992 ("1992 Agreement") and effective through March 30, 2000. The CBA, which was ratified by the Union membership, provided lifetime job guarantees for 190 chapel members and "life of contract guarantees" that ran for the length of the CBA for the remaining chapel members. The CBA also included a "wage reopener" provision, pursuant to which the parties were to enter negotiations in 1996 to set wages for the years 1996-2000. If negotiations were unsuccessful after 30 days, the CBA required the parties to submit the wage issue to binding arbitration.
 
 
 4
 In February 1996, the parties began wage reopener negotiations. The Union was represented at the negotiations by its bargaining committee (referred to as the "Wage and Scale Committee"), the members of which were the Union President, defendant McDonald, the Business Representative, defendant Mitchell, and five chapel members. After some unsuccessful bargaining sessions, the parties broadened their discussions to include certain non-wage issues. For example, the parties discussed the Times's effort to print and assemble certain copies of its newspaper outside of the New York area, the subject of a separate "Northeast Corridor" agreement dated April 24, 1981, to which the Times and the Union were parties. The parties also considered the issue of lifetime guarantees for Union members beyond those who had them.
 
 
 5
 On April 8, 1996, in response to the expansion of negotiation topics, certain Union members attempted to implement a Union bylaw provision which permits a chapel to elect a representative who is not a chapel officer to serve on the Wage and Scale Committee. President McDonald declined one member's request to be put on the Committee but expressed his willingness to accept a member recommended by the chapel. In addition, a Union Vice President, Robert Smith (who was not a chapel officer), had been elected chapel representative in 1987 for earlier negotiations and remained on the Wage and Scale Committee in February, 1996.
 
 
 6
 On May 31, 1996, the Union and the Times reached a tentative agreement (the "Agreement"). The Agreement, inter alia, established wages for the remainder of the CBA term, included lifetime job guarantees for those members who did not already possess them, and established a voluntary $70,000 buyout option for Union members. In exchange for these benefits, the Times obtained a modification to the Northeast Agreement that permitted the Times to assemble and distribute newspapers outside the New York area.
 
 
 7
 The Union distributed the Agreement to its membership on June 4, 1996, though the parties dispute whether all members received a copy. In addition, despite the fact that the Union's constitution and bylaws did not require ratification of the Agreement, the Union, as had been its practice, sent out a notice scheduling a meeting to discuss and vote on the Agreement. At a June 17 meeting, the Union membership discussed the Agreement, and on July 8 the Union held a second meeting at which, after additional debate, the Agreement was rejected by a secret ballot vote of 142 to 123.
 
 
 8
 Following the rejection of the Agreement, the Union added an elected chapel member to the Wage and Scale Committee and sought to negotiate a better deal for the membership.
 
 
 9
 On September 4, 1996, after a series of chapel meetings to discuss further demands, the Wage and Scale Committee met with the Times. The Times refused to alter the substantive terms of the Agreement and declared an October 1 deadline for the Union to either ratify the Agreement or proceed to arbitration. At a following chapel meeting, the Union informed the membership of the Times's position and that it would begin preparing for arbitration.
 
 
 10
 Thereafter, a Union member, Rita Jean, circulated a petition requesting a second vote on the Agreement. Plaintiffs contend that the Union leadership assisted in the preparation of the petition and encouraged members to sign it. In any event, the petition ultimately was signed by over 200 Union members, and the Union scheduled a second vote to ratify the Agreement.
 
 
 11
 On September 25, plaintiff John Shea circulated a petition requesting a "Special Order of Business Meeting" to determine the propriety of a re-vote under Union bylaws. In the face of the two conflicting petitions, President McDonald canceled the scheduled re-vote and called a Special Order of Business Meeting to determine whether the Agreement should be re-submitted to the membership for a second vote.
 
 
 12
 At the Special Order of Business Meeting, held on October 10, the members decided by a vote of 174 to 74 to proceed with a second vote. The re-vote was conducted on October 31 by secret ballot, and this time the Agreement was ratified by a vote of 195 to 171. Plaintiffs then filed this lawsuit in the United States District Court for the Southern District of New York seeking reversal of the October 31 ratification vote and damages.
 
 
 13
 Plaintiffs' Second Amended Complaint alleged three causes of action against the Union Defendants: (1) breach of the Union constitution and bylaws; (2) violation of Section 101(a)(1) of the LMRDA; and (3) breach of the Union's duty of fair representation. Plaintiffs asserted a fourth cause of action against the Times, alleging that the Times unlawfully colluded with the Union and thereby caused the breach of the Union's duty of fair representation.
 
 
 14
 All defendants moved for summary judgment and plaintiffs filed a motion for partial summary judgment on its claim that the Union Defendants breached the Union's constitution and bylaws. In an Opinion and Order filed on March 23, 1998, Judge Baer granted defendants' motion for summary judgment, denied plaintiffs' motion for partial summary judgment and dismissed the complaint in its entirety. See Sim v. New York Mailers' Union No. 6, 1998 U.S. Dist. LEXIS 3513, at * 7-20, 1998 WL 132793 (S.D.N.Y. Mar. 23, 1998).
 
 
 15
 Plaintiffs now appeal from the district court's decision.
 
 II. DISCUSSION
 
 16
 We review the district court's order granting summary judgment de novo. See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149 (2d Cir.1998). Summary judgment may be granted only when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, we will uphold a grant of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating whether a genuine issue of material fact exists, however, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." Anderson, 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted).
 
 A. Breach of Governing Documents Claim
 
 17
 Appellants contend that the district court erred in granting summary judgment to the Union defendants on plaintiffs' claim that the Union defendants breached the Union's constitution and bylaws. Plaintiffs alleged that the Union defendants breached the Union's constitution and bylaws by (1) submitting the Agreement to a re-vote on October 31, 1996, (2) failing timely to elect a chapel representative, and (3) failing to call a chapel meeting six months prior to the date of the wage reopener negotiations for the purpose of eliciting proposals from the membership. Plaintiffs also contend for the first time on appeal that the Union breached the bylaws of its International by failing to submit the contract proposal to the International Union for "review and approval." This last issue is waived because plaintiffs failed to raise it in the district court and we shall not consider it. See Greene v. United States, 13 F.3d 577, 585-86 (2d Cir.1994).
 
 1. Governing Standards
 
 18
 After briefing was completed in this case, but before oral argument, we decided Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120 (2d Cir.1998). Spellacy involved a claim by eighty-eight former pilots of Pan American Airlines ("Pan Am") that the Airline Pilots Association-International ("ALPA") had breached its duty of fair representation by failing to fight for the pilots' rights under a collective bargaining agreement and by acting in bad faith. The Pan Am pilots alleged bad faith by the ALPA in failing to follow its own constitution and bylaws when it adopted a certain Pan Am pilot training plan in the absence of a written agreement with Pan Am. In evaluating a union's interpretation of its own CBA, we announced the following standard:
 
 
 19
 "[t]o uphold the union's action in interpreting the contract as it did it is not necessary that we find on the merits that such an interpretation was correct." Rather, our inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the pilots' claim in light of the language contained in the collective bargaining agreement.
 
 
 20
 Id. at 127 (quoting Tedford v. Peabody Coal Co., 533 F.2d 952, 957 (5th Cir.1976)).
 
 
 21
 We went on to reject the pilots' claim that the ALPA breached its constitution and bylaws. In so doing, we afforded great deference to the ALPA's interpretation of its governing documents, holding that "[s]ince 'ALPA's interpretation of its governing documents is not unreasonable[,] by following its own interpretation ALPA did not breach its [duty of fair representation] in bad faith.' " Id. at 128 (alteration in original) (quoting O'Neill v. Air Lines Pilots Ass'n Intern., 939 F.2d 1199, 1207 (5th Cir.1991)).
 
 
 22
 Given the standard we used in Spellacy, we believe that Judge Baer accurately reflected the law of this circuit when he stated below that "[a] Union's interpretation of its own constitution is entitled to great deference[ ] in order to avoid interference with internal union affairs .... and [t]herefore, the interpretation of bylaw provisions by Union officials will be upheld unless patently unreasonable." Sim, 1998 U.S. Dist. LEXIS 3513, at * 7-8, 1998 WL 35058 at * 4 (citing Newell v. Int'l Bhd. of Elec. Workers, 789 F.2d 1186, 1189 (5th Cir.1986)). Thus, while appellants correctly point out that courts will ignore interpretations made by union officials which run adverse to the plain meaning of contract language, they wrongly assert that the Union's interpretation of its constitution and bylaws is not entitled to special weight. We will defer to the Union's interpretation of its governing documents unless that interpretation is " 'patently unreasonable.' " Newell, 789 F.2d at 1189 (quoting Stelling v. IBEW, 587 F.2d 1379, 1389 (9th Cir.1978)).
 
 2. The Propriety of the Second Vote
 
 23
 Appellants claim that the Union breached its constitution and bylaws by submitting the Agreement to a second vote on October 31, 1998. Specifically, they contend that the Union violated Article XVI, § 20 of its bylaws, which states: "Any member who voted with the majority may, at the same or next meeting, move for a reconsideration of any vote, except one by ballot; but, if once negatived, it shall not again be renewed." The Union Defendants respond that this provision was inapplicable because (1) the Union's bylaws and constitution did not require a ratification vote at all, and (2) the Union reasonably interpreted the clause "except one by ballot" to mean that when a vote was by secret ballot anyone could seek reconsideration, not just a member who voted in the majority, because it would not be known from a secret ballot who was in the majority.
 
 
 24
 We agree with appellees' second contention and therefore do not consider their argument that the provision was inapplicable because there was no requirement that Union members ratify the Agreement in the first place. It is reasonable to read Article XVI, § 20 as providing a non-exclusive method by which a member who votes with the majority may call for a re-vote. Because a secret ballot does not reveal which members voted with the majority, however, it is at least reasonable for the Union to interpret the provision as permitting any member who participates in the vote to call for a re-vote. Accordingly, we hold that the re-vote did not violate Article XVI, § 20 of the Union bylaws.
 
 
 25
 3. Failing Timely to Elect a Chapel Representative
 
 
 26
 Appellants' second contention that the Union violated its bylaws by failing timely to elect a chapel representative other than a chapel officer[2] is meritless for the reasons stated by the district court. See Sim, 1998 U.S. Dist. LEXIS 3513, at * 9, 1998 WL 132793. First, Robert Smith, a chapel member and Union Vice President--but not a chapel officer--was elected to serve on the Wage and Scale Committee in 1987, and remained, unchallenged, as a Committee member through the duration of the wage reopener negotiations. It was reasonable for the Union to interpret Smith's continuing service on the Committee as fulfilling the bylaw requirement.
 
 
 27
 In any event, Ralph Tuttle was elected as a chapel representative to the Wage and Scale Committee before the last bargaining session with the Times, thereby curing any possible defect in Smith's service on the Wage and Scale Committee.
 
 4. Failing to Call a Chapel Meeting
 
 28
 Finally, appellants argue that by not calling a chapel meeting six months prior to the wage reopener negotiations, the Union violated Article XV, § 22 of the bylaws. Section 22 provides:
 
 
 29
 [The Chairman] shall call a Chapel Meeting six months prior to the expiration of the present contract for the purpose of introducing propositions for the new contract. The propositions must be presented in writing and signed by the Chairman before the next Union Meeting.
 
 
 30
 The Union responds that this provision was inapplicable to the wage reopener, since, according to its interpretation, the Agreement was not a "new contract" but a mid-term modification of the CBA.
 
 
 31
 Again, we believe that the Union's interpretation of this provision as only requiring a chapel meeting prior to the expiration of the CBA in the year 2000 was not "patently unreasonable," given the ambiguity of the phrase "new contract" in this context. Accordingly, we affirm the district court's dismissal of appellants' breach of governing documents claim against the Union defendants.
 
 B. LMRDA Claim
 
 32
 Section 101(a)(1) of Title I of the LMRDA provides:
 
 
 33
 Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
 
 
 34
 29 U.S.C. § 411. Plaintiffs claim that the Union violated their rights under § 101(a)(1) by, inter alia, (1) intimidating Union members opposed to the Agreement, (2) coercing members to sign the Jean petition for a second vote, and (3) violating the Union's bylaws in the manner discussed above in Part II.A.
 
 
 35
 In support of their contention, plaintiffs rely on Farkas v. Rumore, 881 F.Supp. 884 (S.D.N.Y.1995), and Members for a Better Union v. Bevona, 972 F.Supp. 240 (S.D.N.Y.1997). In both Farkas and Bevona, Southern District courts held that once a union has provided its members with the right to vote, the union must extend that right in a "meaningful" manner. See Farkas, 881 F.Supp. at 888-89 (finding summary judgment inappropriate where plaintiffs alleged that union officials violated Section 101(a)(1) by, inter alia, holding a vote two days after a tentative agreement was reached and lying about terms of the agreement); Bevona, 972 F.Supp. at 244-45 (holding that "[a] fair referendum assuring the equal right to vote under § 101(a)(1) includes the right of members to have the vote scheduled at a time when they can exercise their vote and the right to be free from intimidation or fear of reprisal...."). These cases, however, which the district court distinguished on their facts, are no longer good law.
 
 
 36
 In Members for a Better Union v. Bevona, 152 F.3d 58 (2d Cir.1998), we vacated the district court decision relied on by plaintiffs, and narrowed the scope of claims which may be brought under § 101(a)(1). Relying on the Supreme Court's interpretation of § 101(a)(1) in Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), we stated that "to be viable, a claim under § 101(a)(1) must ... allege the denial of some privilege or right to vote which the union has granted to others." Bevona, 152 F.3d at 65. Specifically, we held that plaintiffs' allegations in that case--that (1) the timing of a union vote may have dissuaded members from voting, and (2) the vote was "tainted" by the actions of union leaders--failed to allege discrimination under § 101(a)(1) and that dismissal for lack of subject matter jurisdiction was therefore appropriate. See id. at 67.
 
 
 37
 As was true in Bevona, plaintiffs in this case have failed to state a valid LMRDA claim. Plaintiffs' Second Amended Complaint, while chock full of alleged misconduct by Union officials and Times's foremen, contains no allegation that plaintiffs were the subject of discrimination or were denied a right to vote that the Union granted to other members. See id. We therefore vacate the district court's decision on plaintiffs' LMRDA claim and remand for the district court to dismiss the claim for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). See id.
 
 C. Duty of Fair Representation Claim
 
 38
 It is well-established that a union has a duty to represent fairly all union members in the negotiation of a collective bargaining agreement. See Spellacy, 156 F.3d at 126 (citing O'Neill, 499 U.S. at 74, 111 S.Ct. 1127). This duty "is implied under the scheme of the National Labor Relations Act." White v. White Rose Food, 128 F.3d 110, 113 (2d Cir.1997) (citing DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)). "A union breaches its duty of fair representation if its actions 'can fairly be characterized as so far outside a wide range of reasonableness ... that [they are] wholly arbitrary, discriminatory, or in bad faith.' " Spellacy, 156 F.3d at 126 (alterations in original) (quoting O'Neill, 499 U.S. at 67, 111 S.Ct. 1127). Bad faith requires a showing of fraudulent, deceitful, or dishonest action. See Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir.1992).
 
 
 39
 Appellants contend that the district court erred in following Ackley v. Western Conference of Teamsters, 958 F.2d 1463 (9th Cir.1992), which held that to prevail on a fair representation claim, plaintiffs, in addition to establishing that a union acted unreasonably and in bad faith, must allege a causal connection between the union's wrongful conduct and the alleged injuries. See Ackley, 958 F.2d at 1473. Once again, plaintiffs' argument that such causation is not required is foreclosed by recent case law. In Spellacy, citing Ackley with approval, we held that
 
 
 40
 [e]stablishing that the union's actions were sufficiently "arbitrary, discriminatory or in bad faith," is only the first step toward proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries.
 
 
 41
 Spellacy, 156 F.3d at 126. Accordingly, the district court was correct in stating that, in addition to proving that the Union acted arbitrarily and in bad faith, plaintiffs must demonstrate that any alleged misconduct had an effect on the outcome of the second ratification vote. See Sim, 1998 U.S. Dist. LEXIS 3513, at * 14, 1998 WL 132793.
 
 
 42
 Included in the laundry list of misconduct alleged by plaintiffs as evidencing the Union's breach of its duty of fair representation are the following: (1) that Union officials and Times's foremen[3] misrepresented the Times's plans for layoffs in the year 2000 by telling Union members that "between 200 and 300 jobs would be lost unless the [Agreement] was ratified," (2) that the Union violated its governing documents by permitting the second vote to ratify the Agreement and by failing to permit the election of a chapel representative, and (3) that one Union official who participated in the negotiations attacked a member speaking on issues related to the Agreement.[4]
 
 
 43
 First, for the reasons stated in Part II.A. above, the Union's decision to permit a second vote and to construe Robert Smith as the chapel representative did not violate the Union's constitution or bylaws, and cannot, therefore, be deemed misconduct that supports a fair representation claim. As for the remaining allegations, we have serious doubts that any of the alleged acts of misconduct could fairly be "characterized as so far outside a wide range of reasonableness ... that [they are] wholly arbitrary, discriminatory, or in bad faith." Spellacy, 156 F.3d at 126. In any event, because we find that plaintiffs are unable to demonstrate a causal connection between the Union's alleged misconduct and the outcome of the ratification vote, we conclude that plaintiffs' fair representation claim must fail, regardless of whether the Union's alleged misconduct rises to the level of fraudulent, deceitful or dishonest action. See Mock, 971 F.2d at 531. While the record evidence is disputed, the most plaintiffs have shown is that two members may have changed their votes in response to pressure from Union members. Because the Agreement ultimately passed by twenty-four votes, the causation element has not been satisfied. Accordingly, we affirm the district court's dismissal of plaintiffs' fair representation claim.
 
 
 44
 D. Collusion Claim Against the New York Times
 
 
 45
 Given our resolution of plaintiffs' fair representation claim against the Union Defendants, plaintiffs' claim that the Times unlawfully colluded with the Union in breaching its duty of fair representation also must fail. See United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 62, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).
 
 CONCLUSION
 
 46
 For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part and remanded for the district court to dismiss plaintiffs' LMRDA claim for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). Plaintiffs will bear costs.
 
 
 
 [1]
 Plaintiffs Walter Sim and John Shearer both retired after accepting voluntary buyouts
 
 
 [2]
 The relevant bylaw, enacted by a membership vote in 1979, states:
 Each chapel participating in the contract shall elect one representative (other than a chapel officer) to serve on the Wage and Scale Committee. Election is to take place with chapel elections prior (sic) contract expiration and terms of office to expire with contract approval.
 
 
 [3]
 We do not decide the issue of whether the foremen somehow acted as agents of the Union in pressing for ratification in light of our finding that plaintiffs have failed to establish a causal connection between any alleged misconduct and the outcome of the ratification vote
 
 
 [4]
 As to this incident--the most serious of plaintiffs' allegations--the record does not support plaintiffs' strained effort to connect the altercation to the debate surrounding the Agreement