156 F.3d 120
 159 L.R.R.M. (BNA) 2336
 Edward J. SPELLACY, Jr.; Stewart W. Beckett, Jr.; Raymond
H. Albers, II; Gordon N. Almquist; Gary K. Armstrong;
Donald G. Arneson; James Bailey; W. Schafer Bean; William
Harvey Benefield; Tad H. Bingham; Vidmantas K.
Bliumfeldas; Rudolph Brabenec; Robert E. Brickey; Michael
D. Burke; Dallas E. Butler; James R. Byrne; James Canitz;
Gerald W. Cassidy; Robert C. Cassube; Thomas Ceranic;
David M. Criley; John W. Cunningham; Donald E. Dale, Jr.;
Michael J. Dunn; Thomas G. Ebbert; Gerald L. Ellison;
Jerome P. Fox; Robert K. Frank; Howell J. Gannon;
Benjamin F. Greer; Robert L. Harrell; Albert G. Harrison;
William H. Hart; Reginald W. Havill; Robert H. Hays;
David K. Holland; Thomas L. Hurd; David E. Jones; Austin
L. Joyner; Terrence J. Kane; David A. Klau; Donald K.
Law; Byron C. Lewin; Manuel J. Lewis; Keith J. Mackey;
John A. Marshall; Kenneth G. McAdams; Robert C. McGrory;
Jan A. Menke; James W. Miller; John R. Neff; Ernest J.
Neuwald; Thomas M. O'Dell; Terry W. Pope; Michael E.
Ranslam; Frank C. Rice; Richard D. Robbins; Jack J.
Rogers; Stanley A. Roitz; K. David Savage; Carl E.
Schmeusser; George H. Schumacher; Conrad E. Smith; Dorsey
L. Spaulding; Michael N. Stafford; William A. Stevens;
Timothy G. Sullivan; M. Joel Thompson; John W. Tiger;
Constantine G. Vlahakis; J. Robert Wardin; John S.
Wentworth; John L. White; John N. Zoller; Donato
D'Angelico; Keith Erlewine; Alto J. Furlong, Jr.; Kenneth
Lemming; William A. Pitsker; Harry Shepard; Bill M.
Shuster; and Frank Z. White, Plaintiffs-Appellants,
v.
AIRLINE PILOTS ASSOCIATION-INTERNATIONAL; J. Randolph
Babbitt, III; Richard L. Burke; Sigfrid W. Hauck; Kenneth
C. Lankford; John Mitvalsky; Robert E. Anderson; Robert
F. Bible; G. Hart Kelley; and Gustave M. Littlefield,
Defendants-Appellees.
 No. 97-7666.
 United States Court of Appeals,
Second Circuit.
 Argued April 3, 1998.
Decided Aug. 12, 1998.
 
 Mark R. Kravitz, Wiggin & Dana, New Haven, Connecticut (Daniel J. Klau, of counsel), for Plaintiffs-Appellants.
 Michael E. Abram, Cohen, Weiss and Simon, New York City (Peter Herman, Thomas N. Ciantra, Tamir W. Rosenblum, of counsel), for Defendants-Appellees.
 Before: McLAUGHLIN, PARKER, Circuit Judges, and HURLEY, District Judge.*
 BACKGROUND
 McLAUGHLIN, Circuit Judge.
 
 
 1
 Pan American Airlines ("Pan Am") went bankrupt. Plaintiffs-Appellants are 88 of the approximately 1600 pilots who used to fly for Pan Am. These pilots were represented by the Airline Pilots Association-International ("ALPA"), the certified collective bargaining representative for pilots employed by all the major airlines operating in the United States. Under ALPA's union structure, the pilots for each airline elect a Master Executive Committee ("MEC"), of pilots. Subject to ALPA's oversight, the MEC makes the collective bargaining decisions for the union in negotiations between the airline and its pilots.
 
 
 2
 The MEC for Pan Am pilots had three officers and four elected representatives. At all times relevant to this appeal, Richard Burke, Robert Anderson, and Gordon Littlefield were, respectively, the Chairman, Vice-Chairman and Secretary-Treasurer of the MEC. The four elected representatives were Sigfried Hauck, Kenneth Lankford, Robert Bible, and G. Hart Kelley.
 
 
 3
 Pan Am occupies a venerable position in the history of American aviation. In the late 1960's, however, Pan Am ran into financial turbulence. After struggling to survive for two decades, Pan Am began to sell assets. In 1985, it sold its Pacific routes to United Airlines ("United"). In late 1990, Pan Am sold additional aircraft and routes to United. However, these asset sales merely delayed the inevitable. In January 1991, Pan Am filed for reorganization under Chapter 11 of the bankruptcy laws.
 
 
 4
 While in reorganization, Pan Am continued to search for potential buyers of its remaining assets. In early July 1991, the MEC informed Pan Am pilots that Delta Airlines ("Delta") had agreed to buy Pan Am's North Atlantic routes and "shuttle" operation. Under the proposed Asset Purchase Agreement ("APA"), Pan Am would sell its entire fleet of Airbus 310 ("A-310") aircraft and up to 19 of its Boeing 727 ("B-727") aircraft to Delta. In return, Delta would sponsor and fund Pan Am's reorganization as a going airline, purchase a 45% equity stake in Pan Am, and establish a marketing alliance with Pan Am.
 
 
 5
 Pan Am also agreed to supply Delta with nearly 800 pilots who were "current and qualified" on those two planes. A "current and qualified" pilot is one who is trained to fly a particular airplane and has made three takeoffs and landings on that plane within the last ninety days. Delta needed approximately 494 qualified pilots for the A-310 aircraft and 280 for the B-727. Since Pan Am did not have enough "current and qualified" pilots to satisfy Delta's needs, it needed to train some of its pilots for transfer to Delta. Pan Am and Delta agreed that the transfer of pilots and assets would occur no later than November 1, 1991.
 
 
 6
 On July 20, 1991, Pan Am's crew chief, Vito Cutrune, presented a proposal to Pan Am, Delta, and the MEC that would allow Pan Am to offer pilot training on a strict seniority basis. He concluded that Pan Am had enough money and flight simulator capacity to complete 120 "long course" training programs for the A-310 and 22 long course programs for the B-727. Long course programs were designed for pilots who had never before flown the A-310 or B-727. Accordingly, since every Pan Am pilot would be eligible for training under Cutrune's proposal, the training would be offered on a strict seniority basis.
 
 
 7
 The long course training proposal was consistent with the seniority-based methodology by which most Pan Am pilot assignments were determined. The Pilot Working Agreement ("PWA"), the collective bargaining agreement between Pan Am and its pilots, provided that whenever Pan Am projected a major change or "shift" in its flight operations, it announced the change to the pilots and issued a "proffer." See PWA §§ 3, 5. The new flight positions were posted in the proffer and pilots had an opportunity to "bid" for these positions. Pan Am then issued "awards" to the pilots, based on their seniority. See id.
 
 
 8
 On July 24, 1991, as Pan Am and Delta were finalizing the APA, Pan Am rejected the strict seniority plan. Pan Am explained that it could not accept the long course proposal because: (1) there was insufficient time to train the requisite number of pilots before Delta's deadline; and (2) even if the training could be accomplished in time, training by seniority would decimate the ranks of senior Pan Am captains needed to continue Pan Am's operations after the sale.
 
 
 9
 The MEC sought to accommodate Pan Am by presenting an alternate plan, entitled the "System Seniority Transfer Plan." Under this plan, pilots could gain eligibility for transfer by training after the November 1, 1991 deadline set by Pan Am and Delta. Upon completion of their training, these pilots would transfer to Delta, thereby bumping to the bottom of Delta's seniority list junior pilots who had transferred on November 1, 1991. On July 31, 1991, Delta rejected the System Seniority Transfer Plan, explaining that training after November 1, 1991 conflicted with its plan for a "turn-key" operation and would result in too many senior pilots being hired, adversely affecting the normal Delta cross-section and profile of airmen.
 
 
 10
 On August 2, 1991, the MEC met to discuss how pilots would be trained for transfer to Delta. After debating various training and transfer plans, it presented a new plan calling for "short course" training on the A-310. Short course training is a refresher course for pilots who had once flown, but are no longer qualified to fly, a particular airplane. Under the short course plan, only pilots who had previously flown the A-310 were eligible for training. While few Pan Am pilots had experience flying the A-310, four members of the MEC had flown this plane.
 
 
 11
 The short course plan was supported by Cutrune, Pan Am's crew chief, who told Pan Am executives that his original training proposal, long course training, was simply not feasible. He said that under his "revised analysis," the necessary simulator time for long course training on the A-310 could not be arranged before the date of sale. Cutrune explained, however, that the short course plan could be accomplished. On August 8, 1991, Pan Am and Delta decided to adopt the short course plan for the A-310.
 
 
 12
 Rather than informing the pilots that a training plan had now been adopted, the MEC told the pilots that Delta was still open to alternative plans. They assured the pilots that Delta would listen to any plan designed to preserve the integrity of the seniority system. The MEC also told the pilots that, rather than deciding which of the competing plans it would endorse, ALPA and the MEC would let an arbitrator decide which plan best served the union's interests. However, since Pan Am and ALPA had agreed in principle on a plan governing retraining on the A-310, the only issue presented to the arbitrator was the B-727 training. The arbitrator recommended a training plan for the B-727 based on strict seniority.
 
 
 13
 Following the arbitrator's decision, ALPA, Pan Am, and Delta entered into a formal agreement defining the training for Pan Am pilots. ALPA agreed that the short course training would be used for the A-310, but a strict seniority system would be used to select pilots for B-727 training. The Bankruptcy Court approved this agreement. When Pan Am sold the planes and routes in November 1991, six of the seven MEC members were on the list of pilots to be transferred to Delta. Shortly thereafter, Pan Am went out of business.
 
 
 14
 Accusing the MEC pilot members of feathering their own nests, two groups of pilots sued ALPA and the individual members of the MEC. The first group, the "Spellacy" pilots, commenced an action in the United States District Court for the District of Connecticut (Dorsey, J.), alleging that ALPA and the MEC breached their duties of fair representation by adopting the short course training plan. The Spellacy pilots asserted that ALPA and the MEC violated their duties because: (1) the PWA required that training opportunities be awarded on a strict seniority basis and ALPA failed to protect the pilots' contractual rights; and (2) ALPA and the MEC advocated the short course plan so that they could secure pilot positions for themselves.
 
 
 15
 The second group, the "Duke" pilots, filed an action in the United States District Court for the Eastern District of New York (Weinstein, J.). These pilots each held a " proffer,"--i.e., an offer from Pan Am to be transferred to Delta. These proffers had been given before Pan Am realized that it lacked a sufficient number of qualified pilots to send to Delta. The Duke pilots alleged that ALPA should first have ensured that Pan Am honored the existing proffers before implementing a training program.
 
 
 16
 The actions were consolidated for trial in the United States District Court for the Eastern District of New York pursuant to 28 U .S.C. § 1404(a) and Fed.R.Civ.P. 42(a). Judge Weinstein bifurcated the trial, directing that the issue of liability be tried first. In June 1996, following a three-week trial and three days of deliberations, the jury returned a verdict for both sets of plaintiffs. The jury found that ALPA had breached its duty of fair representation to both the Duke and Spellacy pilots by engaging in bad faith, arbitrary, and discriminatory conduct. The jury found that 82 Spellacy plaintiffs and 12 Duke plaintiffs had been injured by ALPA and MEC's conduct. ALPA made a timely motion to set aside the verdict and for judgment as a matter of law.
 
 
 17
 While this post-trial motion was pending, the Duke pilots settled with ALPA. Nearly one year after the jury verdict was rendered, Judge Weinstein set aside the verdict for the Spellacy pilots and granted ALPA's motion for judgment as a matter of law. By Memorandum Order and Judgment dated April 14, 1997, amended April 21, 1997, Judge Weinstein held that: (1) the PWA did not require Pan Am to train pilots on a strict seniority basis; (2) the A-310 short course training plan constituted a reasonable balancing between seniority and cost; and (3) there was insufficient proof that the MEC placed their interests above those of the pilots.
 
 
 18
 Alternatively, Judge Weinstein held that a new trial on the issue of ALPA's liability was warranted. If the grant of judgment as a matter of law was eventually reversed, Judge Weinstein believed that the liability phase should be retried because the evidence did not support a verdict for the Spellacy pilots and the jury "may have been swayed by prejudice against the [MEC]."
 
 
 19
 The Spellacy pilots now appeal, challenging both prongs of Judge Weinstein's decision. In response, ALPA argues that even if Judge Weinstein's decision was improper, a new trial is required due to errors in Judge Weinstein's jury instructions.
 
 DISCUSSION
 Judgment as a Matter of Law
 
 20
 The pilots argue that Judge Weinstein erred when he granted ALPA's motion for judgment as a matter of law. They contend that, viewing the evidence in the light most favorable to their claims, either: (1) ALPA breached its duty of fair representation by failing to fight for the pilots' rights under the PWA; or (2) ALPA and the MEC engaged in various additional acts that constituted arbitrary, discriminatory, or bad faith conduct.
 
 A. Standard of Review
 
 21
 We review de novo the district court's order granting judgment as a matter of law. See Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir.1997). "While it is hornbook law that we may not substitute our view of the evidence for the jury's when that evidence allows multiple legitimate inferences," Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108 (2d Cir.1997) (citations omitted), we will affirm a grant of judgment as a matter of law when "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [it]." Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir.1994) (quotation omitted); see Binder v. Long Island Lighting Co., 57 F.3d 193, 199 (2d Cir.1995).
 
 B. Duty of Fair Representation
 
 22
 A union, of course, has a duty to represent fairly all employees subject to the collective bargaining agreement. See, e.g., Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). This duty extends to both the negotiation of a collective bargaining agreement, see Ford Motor Co. v. Huffman, 345 U.S. 330, 336, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), and its enforcement and administration. See Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 23
 A union breaches its duty of fair representation if its actions "can fairly be characterized as so far outside a 'wide range of reasonableness' ... that [they are] wholly 'arbitrary, discriminatory, or in bad faith.' " O'Neill, 499 U.S. at 67, 111 S.Ct. 1127 (quotation omitted). Judicial review of union action, however, " 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.' " Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1106 (2d Cir.1991) (quoting O'Neill, 499 U.S. at 67, 111 S.Ct. 1127).
 
 
 24
 A union acts in bad faith when it acts with an improper intent, purpose, or motive. See Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir.1992). Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct. See, e.g., Baxter v. United Paperworkers Int'l Union, Local 7370, 140 F.3d 745, 747 (8th Cir.1998); Mock, 971 F.2d at 531.
 
 
 25
 Establishing that the union's actions were sufficiently "arbitrary, discriminatory or in bad faith," is only the first step toward proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries. See, e.g., Ackley v. Western Conference of Teamsters, 958 F.2d 1463, 1472 (9th Cir.1992); Williams v. Romano Bros. Beverage Co., 939 F.2d 505, 508 (7th Cir.1991).
 
 1. Bad Faith Conduct
 
 26
 The pilots adduce a welter of evidence presented during the three-week trial to support the jury's finding that ALPA acted in bad faith. Essentially, they contend that the jury could have found that ALPA acted in bad faith when it: (1) abandoned the principle of seniority mandated by Section 3-A of the PWA; (2) failed to follow its own constitution and by-laws by adopting Pan Am's training plan without a written decision; (3) entered into "secret" agreements designed to protect the interests of the MEC members at the expense of the Spellacy pilots; (4) made material misrepresentations designed to prevent the disclosure of the secret agreements; and (5) declined to represent or assist the pilots in filing and prosecuting their grievances. We are not persuaded.
 
 Section 3-A of the PWA provides that:
 
 27
 Seniority shall govern all pilots in case of promotion or demotion, their retention in case of reduction of force, their assignments or reassignments due to expansion or reduction in force, their choice of vacancies, placement or replacements, provided that the pilot is sufficiently qualified for the conduct of the operation to which he is assigned; and, in the event the pilot is considered by [Pan Am] not to be sufficiently qualified, [Pan Am] shall furnish the pilot written reasons therefor. Section 3-A shall apply except where specifically excepted in the [PWA].
 
 
 28
 The pilots construe this provision to apply because either: (1) Section 3-A is the "default" provision and nothing in the PWA preempts application of its strict seniority rule; or (2) the transfer of pilots and equipment to Delta constituted a "reduction in force" within the meaning of Section 3-A. Thus, their argument runs, because Pan Am was contractually obligated to offer pilot training on a strict seniority basis, ALPA breached its duty of fair representation by concluding that the PWA did not govern training for transfer to Delta. ALPA responds that Section 3-A refers only to Pan Am's operations, and its interpretation that the PWA does not apply to training pilots for transfer to Delta as part of a partial asset sale is, therefore, not unreasonable. Essentially ALPA's argument is that its interpretation does not have to be right. It need only be plausible.
 
 
 29
 "To uphold the union's action in interpreting the contract as it did it is not necessary that we find on the merits that such an interpretation was correct." Tedford v. Peabody Coal Co., 533 F.2d 952, 957 (5th Cir.1976) (citing Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). Rather, our inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the pilots' claim in light of the language contained in the collective bargaining agreement. See id. (union's contract interpretation must be reasonable and "(1) based upon relevant, permissible union factors which (exclude) the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees"); see also, e.g., Bache v. American Tel. & Tel., 840 F.2d 283, 290 (5th Cir.1988).
 
 
 30
 ALPA's position that Section 3-A does not apply in the context of a partial asset sale, while arguably wrong, is not so unreasonable as to constitute a breach of the duty of fair representation. Section 3-A does not make any reference to employee rights in the event of an asset sale; it merely requires that rights provided in the PWA be allocated by seniority unless preempted by another provision of the PWA.
 
 
 31
 Moreover, while the PWA contained a few provisions related to asset sales, none provided the rights claimed by the pilots. Section 35, entitled "Acquisitions and Sales," guaranteed the union's right to negotiate with Pan Am concerning the effects of an asset sale. Section 1.E provided special protection to junior pilots who were furloughed because of a sale of routes. Section 1.D required any successor carrier that might take control of Pan Am to operate under the PWA, absent an agreement to the contrary among the union, Pan Am, and the successor carrier.
 
 
 32
 In light of the PWA provisions specifically defining the rights and responsibilities of Pan Am and ALPA during a partial asset sale, ALPA's decision to accept Pan Am's view that Section 3-A's generic seniority provision applied only to Pan Am's operations--and not Delta's--is not unreasonable. See Flanigan v. (International Bhd. of Teamsters, Warehousemen & Helpers of Am.) Truck Drivers Local No. 671, 942 F.2d 824, 827 (2d Cir.1991) ("[u]nion cannot be faulted for acceding to" employer's logical interpretation of seniority provision).
 
 
 33
 Pan Am's conduct during earlier asset sales also supports ALPA's thesis. See Rupe v. Spector Freight Sys., Inc., 679 F.2d 685, 693-94 (7th Cir.1982) (union's interpretation of seniority provision reasonable when consistent with employer's previous practices). In 1985, for example, when Pan Am sold routes to United, Pan Am trained only those pilots with experience on the planes transferred to United, not its most senior pilots. In addition, in its 1988 term sheet for the collective bargaining agreement, Pan Am refused to provide pilots any "assurances" regarding their treatment in an asset sale; and it refused to accept any contractual responsibilities that could jeopardize its ability to complete a transaction.
 
 
 34
 Moreover, in late 1990, when Pan Am sold its London Heathrow routes to United, it did not transfer its pilots solely on the basis of seniority. United agreed to hire pilots in seniority by category (i.e., captains hired to fill captain positions; first officers for first officer positions). As a result, senior captains who sought employment at United, and who were qualified to fill first officer positions, were passed over in favor of junior first officers for the first officer positions. When ALPA subsequently sought Pan Am's agreement to protect senior pilots during asset sales, Pan Am again refused to limit its flexibility.
 
 
 35
 The pilots' alternative contention that Pan Am was required to train pilots for transfer to Delta in order of seniority because the transfer of assets and pilots constituted a "reduction in force" within the meaning of Section 3-A, is similarly unpersuasive. In the case of a reduction in force, Section 3-A entitled pilots to "retention" by Pan Am, not relocation, or training to promote relocation, to another airline.
 
 
 36
 The pilots' remaining bad faith arguments are without merit. They argue that ALPA and the MEC violated the union's constitution and by-laws by allowing Pan Am to amend the PWA without a written agreement. However, ALPA's position that the PWA did not apply to the adoption of a training program was a reasonable construction. Therefore, ALPA believed that Pan Am could proceed without reaching a written agreement with ALPA. Since "ALPA's interpretation of its governing documents is not unreasonable[,] by following its own interpretation ALPA did not breach its [duty of fair representation] in bad faith." O'Neill v. Air Line Pilots Assoc., Int'l, 939 F.2d 1199, 1207 (5th Cir.1991); see Baker v. Newspaper & Graphic Communications Union, Local 6, 628 F.2d 156, 166-67 (D.C.Cir.1980).
 
 
 37
 ALPA's decision not to file grievances on behalf of the effected pilots, or to assist pilots in prosecuting grievances, similarly does not rise to the level of bad faith. While "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," union members do not have an "absolute right to have [their] grievances taken to arbitration." Vaca, 386 U.S. at 191, 87 S.Ct. 903; see Cruz, 34 F.3d at 1153-54; Pyzynski v. New York Cent. R.R. Co., 421 F.2d 854, 864 (2d Cir.1970).
 
 
 38
 In this case, ALPA decided that pursuing a grievance for the senior pilots would be fruitless. It reasoned that under the PWA, Pan Am was only required to consult with ALPA regarding the implementation of an appropriate training plan. Thus, prosecuting pilot grievances would not result in the adoption of a more favorable training program since the most senior pilots did not have a contractual right to receive training for transfer to Delta. This position is reasonable because: (1) ALPA had unsuccessfully attempted to negotiate contractual restrictions on Pan Am's freedom to arrange employment opportunities at other carriers; and (2) Pan Am, on two prior occasions, implemented asset sales involving employee transfers without permitting ALPA to do more than comment on the terms. Because ALPA's decision not to prosecute pilot grievances was based on a reasonable interpretation of the PWA, ALPA did not breach its duty of fair representation. See Chaparro-Febus v. International Longshoremen Ass'n, Local 1575, 983 F.2d 325, 330 (1st Cir.1992).
 
 
 39
 Finally, the pilots contend that ALPA and the MEC forged "secret" agreements with Pan Am and Delta that sacrificed the pilots' rights under the PWA. They assert that the "secret" agreements and subsequent misrepresentations designed to cover their tracks constituted bad faith. The pilots rely on Lewis v. Tuscan Dairy Farms, Inc., 25 F.3d 1138 (2d Cir.1994), and Aguinaga v. United Food & Commercial Workers, 993 F.2d 1463 (10th Cir.1993). This reliance is misplaced.
 
 
 40
 In Lewis and Aguinaga, the unions entered into secret side-agreements with the employer that vitiated clear contractual rights of the employees. However, as discussed above, the Pan Am pilots had no such unambiguous contractual entitlement. Moreover, the employees in Lewis and Aguinaga were tricked into believing that their rights were preserved until it was too late to protest the employer's action. See Lewis, 25 F.3d at 1143; Aguinaga, 993 F.2d at 1471. In contrast, while the MEC delayed confessing its agreement with Pan Am for a period of time (or masked that agreement by claiming that the arbitrator decided the issue), the delay did not prejudice the pilots. The pilots here knew ALPA's position in time to challenge its decision, were aware that Pan Am adopted a training policy contrary to the one advocated by senior pilots, and hired attorneys to file grievances and organize resistance to Pan Am's proposed plan. Under these facts, we cannot say that ALPA or the MEC acted in bad faith by entering into a deal with Pan Am and Delta regarding the selection of pilots for training on the A-310 and B-727 aircraft. See Ryan v. New York Newspaper Printing Pressmen's Union No. 2, 590 F.2d 451, 457 (2d Cir.1979).
 
 2. Arbitrary Conduct
 
 41
 Nor does the evidence support a conclusion that ALPA acted arbitrarily. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' ... as to be irrational." O'Neill, 499 U.S. at 67, 111 S.Ct. 1127 (quoting Ford Motor Co., 345 U.S. at 338, 73 S.Ct. 681). A union's reasoned decision to support the interests of one group of employees over the competing interests of another group does not constitute arbitrary conduct. See, e.g., Haerum v. Air Line Pilots Ass'n, Int'l, 892 F.2d 216, 221 (2d Cir.1989); Jones v. Trans World Airlines, Inc., 495 F.2d 790, 798 (2d Cir.1974).
 
 
 42
 The "factual and legal landscape" surrounding ALPA's decision required the union to balance not only the interests of the Spellacy plaintiffs, but also the pilots who remained at Pan Am and who were counting on the infusion of cash from the Delta deal to keep Pan Am afloat. It was of paramount importance to the remaining pilots that Pan Am meet Delta's deadline. By adopting a short course requalification program, rather than the long course program advocated by the senior pilots, Pan Am could train twice as many pilots in the same number of simulator hours. Such efficient use of its resources would ensure that Pan Am met Delta's hiring goal and save the financially-troubled airline money. Faced with these competing concerns, as well as Pan Am's stated intention to adopt the short course training plan guaranteed to meet Delta's deadline, ALPA's decision constituted a reasoned balancing of the interests of all pilots. Therefore, the evidence did not support the jury's conclusion that ALPA acted arbitrarily. See Ford Motor Co., 345 U.S. at 337, 73 S.Ct. 681; Haerum, 892 F.2d at 221.
 
 3. Discriminatory Conduct
 
 43
 Finally, ALPA did not discriminate against the Spellacy pilots. The pilots contended at trial that the bitter animus between former National Airlines pilots ("Orange pilots"), who came to Pan Am in 1980 when Pan Am purchased National Airlines and who occupied a majority position on the MEC, and the original Pan Am pilots ("Blue pilots"), was a factor in ALPA's acquiescence in the short course training plan. The only evidence offered to support this assertion was a remark made by Burke, a former National Airlines pilot and member of the MEC, that the Delta deal offered an opportunity for former National Airlines pilots to "get out of" Pan Am. However, both the training and transfer plans were facially neutral. In addition, the pilots who did transfer constituted a proportionate mix of former National Airlines pilots and original Pan Am pilots. A reasonable jury could not conclude, based solely on the statement of a single MEC executive, that ALPA's actions arose from prejudice against the original Pan Am pilots. See Griffin v. Air Line Pilots Ass'n, Int'l, 32 F.3d 1079, 1084 (7th Cir.1994) ("statements by highly-placed union officials expressing distaste for pilots who did not join the union" did not support conclusion that union leaders targeted non-union pilots for dismissal, "especially when the shrapnel from the alleged attack also impacted a disproportionate number of union members").
 
 
 44
 Spellacy further claims that the MEC violated its duty of fair representation by placing four "Orange" friends of Burke in training on the B-727. We disagree. The four pilots held "proffers" for B-727 training. In late July 1991, they were displaced from B-727 training when Pan Am began training flight engineers, rather than pilots. After Pan Am denied grievances filed by these pilots, a majority of the MEC voted to ask Pan Am to allow the four pilots to be trained on the B-727.
 
 
 45
 Spellacy, however, failed to adduce any evidence that similarly situated "Blue" pilots were treated differently. Thus, we cannot conclude that the MEC's decision to request that Pan Am train these pilots was motivated by an animus against original Pan Am pilots.
 
 4. Causation
 
 46
 Even if the evidence supported the jury's conclusion that ALPA breached its duty of fair representation, the pilots failed to adduce any evidence that the breach caused their injury.
 
 
 47
 First, the pilots claim that ALPA should have pursued grievances to compel Pan Am to offer training by seniority. However, as noted above, ALPA had no obligation to file meritless claims against Pan Am. See Vaca v. Sipes, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). At most, the pilots' grievances would have resulted in a confirmation of Pan Am's obligation to consult with ALPA over the transfer process. However, individual Pan Am pilots were authorized to pursue grievances without union involvement. Moreover, ALPA did not obstruct the plaintiffs' ability to file grievances. Immediately after the Bankruptcy Court approved the sale agreement between Pan Am and Delta, ALPA representatives explained the agreement to the pilots at meetings in New York and Miami. ALPA advised pilots that they "may file a grievance ... [without] union approval.... [I]f you feel you have been wronged by an incorrect application of our Working Agreement--challenge it." Plaintiffs-Appellants Spellacy, Rice, and Bennett did indeed file grievances without union support. Thus, any injury is independent of ALPA's failure to prosecute the pilots' claims.
 
 
 48
 The pilots' claims regarding the B-727 training similarly fail. The evidence does not support their contention that, absent the alleged breach, Pan Am would have agreed to provide the requisite amount of B-727 training courses. Pan Am never claimed that the facilities for such training were unavailable. Rather, Pan Am indicated that it had a sufficient number of "current and qualified" B-727 pilots to meet Delta's quota. Accordingly, Pan Am refused to accept any proposal requiring the expenditure of money to train pilots for the B-727.
 
 
 49
 Finally, with respect to the A-310 training, the pilots rely upon Cutrune's initial presentation on July 24, 1991, which raised the possibility of providing 120 A-310 and 22 B-727 "long courses" to senior pilots. The July presentation, however, did not create a contractual right to this training plan.
 
 
 50
 During the first week of August, Pan Am determined that it would not initiate any further long course training opportunities due to uncertainties surrounding Delta's quota, the lack of simulator time, and genuine doubts about whether the long course training could be accomplished in time to meet Delta's firm deadline. Pan Am informed the MEC that, even if the MEC opposed the short course plan, Pan Am "would ... move[ ] ahead" without the union's agreement. In light of Pan Am's unambiguous intention to proceed with or without the union's blessing, we cannot say that ALPA's decision not to advocate a seniority-based training system was the cause of the pilots' injuries.
 
 
 51
 Because we conclude that Judge Weinstein correctly granted ALPA's motion for judgment as a matter of law, we need not address either ALPA's contention that Judge Weinstein erred in instructing the jury or the pilots' argument that the grant of a new trial was improper.
 
 CONCLUSION
 
 52
 We have considered all the arguments raised by appellants and find them to be without merit. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Denis R. Hurley of the United States District Court for the Eastern District of New York, sitting by designation