Sherry COOPER, Cynthia Jones, Pamela Jackson, Paige Verducci, Wilson Aviles, Kristine Wolanske, Cathy Whittington, on behalf of themselves and all others similarly situated, and William O'Driscoll as representative of the International Association of Machinists and Aerospace Workers, Plaintiffs,

v.

TWA AIRLINES, LLC, American Airlines, Inc., John Ward as representative of the Association of Professional Flight Attendants, and Donald J. Carty, individually and as Chief Executive Officer of American Airlines, Inc., Defendants.

No. 02–CV–3477 (CBA).

United States District Court, E.D. New York.

June 30, 2003.

■

---

10. Connecticut law also provides qualified immunity, but, only where probable cause exists. *See* Conn. Gen.Stat. § 52–557n(b)(5).

Martin R. Gold, Robert J. Lanza, Sonnenschein, Nath & Rosenthal, New York City, Jeffrey J. Wild, Lowenstein Sandler P.C., New York City, David M. Wissert, Lowenstein Sandler PC, Roseland, NJ, for The International Association of Machinists and Aerospace Workers, Cathy Whittington, Cynthia Jones, Kristine Wolanske, Paige Verducci, Pamela Jackson, Sherry Cooper, Wilson Aviles, The International Association of Machinists and Aerospace Workers, Cathy Whittington, Cynthia Jones, Kristine Wolanske, Paige Verducci, Pamela Jackson, Sherry Cooper, Wilson Aviles.

James N. Blair, Wolman, Babitt & King, LLP, New York City, Daniel M. Katz, Katz & Ranzman, P.C., Washington, DC, for The Association of Professional Flight Attendants.

Thomas E. Reinert, Jr., Morgan, Lewis & Bockius, LLP, New York City, Samuel S. Shaulson, Morgan, Lewis & Bockius, LLP, New York City, for American Airlines, Inc., TWA Airlines, LLC.

## MEMORANDUM & ORDER

AMON, District Judge.

### INTRODUCTION

Plaintiffs represent a class of flight attendants, formerly employed by Trans World Airlines, Inc. ("TWA"), who joined American Airlines, Inc. ("AA" or "American") when AA acquired TWA following TWA's bankruptcy and who are currently scheduled to be furloughed from their jobs on July 2, 2003 as a result of a Restructuring Agreement between AA and the Association of Professional Flight Attendants ("APFA" or "the union"). Plaintiffs move for a preliminary injunction and ask this Court to enjoin AA from implementing the Restructuring Agreement and from effecting their furlough. In order to address adequately the issues raised in this request for preliminary relief, this Court conditionally certifies as a sub-class all former TWA flight attendants who will be furloughed as a result of the implementation of the Restructuring Agreement on July 2, 2003.[1]

For the reasons set forth below, however, the plaintiffs' motion for preliminary relief is denied.

### PROCEDURAL HISTORY

Plaintiffs filed their original complaint in this action on June 14, 2002. On March 3, 2003, plaintiffs filed an amended complaint asserting nine causes of action based on the events that transpired during the acquisition of TWA by American: (1) violation of § 152, Seventh and § 156 of the Railway Labor Act, 45 U.S.C. § 151, *et seq.*; (2) breach of contract; (3) fraud; (4) negligent misrepresentation; (5) fraudulent inducement; (6) breach of the implied covenant of good faith and fair dealing; (7) promissory estoppel; (8) unjust enrichment; and (9) breach of the duty of fair representation.

On June 20, 2003, plaintiffs filed a supplemental complaint ("Supplemental Complaint"), which asserts the three causes of

---

1. This ruling does not resolve defendants' claim that both Sherry Cooper and the International Association of Machinists and Aerospace Workers ("IAM") are not proper class representatives. Because there are other plaintiffs who can serve as class representatives and who do not suffer from the same infirmities as these two plaintiffs, it is not necessary to resolve the issue of the status of IAM and Cooper before granting a conditional certification.

action upon which their application for preliminary relief is based: APFA breached its duty of fair representation by discriminating against the former TWA flight attendants in negotiating labor concessions in response to AA's threatened bankruptcy and by colluding with AA to extend the voting period after a negative vote on the resulting Restructuring Agreement and subsequently approving the Restructuring Agreement (Claim 10); AA aided and abetted APFA's breach of its duty of fair representation (Claim 11); AA and its Chief Executive Officer Donald J. Carty ("CEO Carty") committed fraud by failing to disclose in the negotiating process material information about executive retention bonuses and pension funds that had been approved by AA in October 2002 (Claim 12).

Oral argument was held in this matter on June 20, 2003. Shortly thereafter the Court conducted an evidentiary hearing on June 25–26, 2003, and the parties made closing statements on June 27, 2003. At the evidentiary hearing, the Court heard testimony from Sherry Cooper, the lead plaintiff in this case, Lorraine Mase–Hecker, Director of Employee Policy and Relations for AA, John Ward, President of APFA, John Nikides, a member of the APFA Board of Directors, and Laura Glading, a member of the APFA Negotiating Committee.[2]

### FACTUAL FINDINGS

In 2001, AA acquired the assets of TWA through a pre-packaged deal in Bankruptcy Court, pursuant to which TWA's assets were transferred to TWA, LLC, an entity created by AA. On December 17, 2001, AA concluded an "Agreement on Seniority Integration" ("the Seniority Agreement") with APFA. By the terms of the Seniority Agreement, the former TWA flight attendants were not given seniority credit for their years of TWA service; rather, they were placed at the bottom of AA's seniority list.

Plaintiff Sherry Cooper is a former TWA flight attendant who became an AA flight attendant as a result of the events described above. She is a member of APFA's Board of Directors and was elected to that position by flight attendants at the St. Louis, Missouri hub, TWA's original home base and home base to all of he former TWA flight attendants presently with AA. Ms. Cooper testified that she believes the class she seeks to represent was treated differently from the other AA flight attendants since the time when AA first acquired TWA. Although she indicated that AA's discrimination took the form of a host of little matters, Ms. Cooper only identified two examples that occurred prior to the March 2003 negotiations on a Restructuring Agreement: (1) lack of a computer at her base to bid online and (2) use of the term "furlough cushion" by other flight attendants on the AA website, a term which Cooper understood to refer to the former TWA flight attendants. She also referred to conversations with John Ward, President of APFA, in which he commented on the short time the former TWA flight attendants had been a part of AA and referred to them as "you people."

It is undisputed that in late December 2001 and in early 2002, AA had grave financial problems, which remains the case today. Indeed, the time frame relevant to these events represents one of the worst economic downturns in the history of the airline industry. Since September 11, 2001, over 100,000 airline industry employees have lost their jobs, and since acquir-

---

**2.** In addition to this testimony, the Court received affidavits from Cooper, Ward, Mase– Hecker, and Jeffrey Brundage, Vice–President of Employee Relations for AA.

ing TWA in April 2001, AA reports that it has lost approximately $6 billion. Its economic situation forced AA to seek concessions from all three of its unions (pilots, transport workers, and flight attendants) in an effort to stave off bankruptcy.

In February 2003, AA informed·APFA that it was seeking a concession of $340 million from the flight attendants. In early March 2003, AA offered APFA a proposal which valued certain suggested concessions and set forth the reduction in personnel AA believed would result from those concessions. The concessions represented a head-count reduction of 2,550 flight attendants. *See* Pls.' Ex. 1. This proposal was presented to the APFA Board, which included Ms. Cooper. She made various recommendations which focused on concessions that did not result in the reduction of flight attendants.

On March 10, 2003, at the annual APFA convention, Ms. Cooper, as a Board member, voted in favor of a resolution which recognized that the Board of Directors had been presented with information regarding AA's financial situation and understood that it was in the best interests of the membership to take "all steps to expeditiously address the company's financial situation." (Declaration of John Ward ("Ward Decl."), Ex. B.) The Board further authorized the President and the standing negotiating team to consider changes to the collective bargaining agreement and to take "any and all action needed to reach a negotiated consensual agreement with American Airlines, Inc., in order to avoid bankruptcy." (*Id.*)

Thereafter, APFA's Negotiating Committee and AA officials met to work out the details of the concessions. The APFA members of the negotiating team included John Ward and Laura Glading. Lorraine Mase–Hecker participated in these sessions on AA's behalf. Among the Negoti-

ating Committee's concerns was its desire to preserve as much of its contract as possible.

On March 31, 2003, APFA's Negotiating Committee met with the Board of Directors and advised them of the labor concessions agreed to with AA. A concession sheet was handed out which, without accounting for possible double counting, reflected a reduction of 2,391 flight attendants and a salary cut of 15.8%. (*See* Pls.' Ex. 2.) Among the cost savings was the elimination of severance pay for furloughed flight attendants.

A Restructuring Agreement was put before the union membership for ratification by a telephonic voting process, a process which Ms. Cooper, as a Board member, voted to approve. However, as the APFA Board of Directors noted in a resolution dated April 15, there were "difficulties in the balloting process" and "a number of flight attendants reported that they were unable to cast votes and/or extensive difficulties and confusion encountered with the voting process." (Ward Decl., Ex. B.) It was also noted that changes were made to the Restructuring Agreement while balloting proceeded. (*Id.*) Because of these difficulties, APFA sought to extend the time for voting to permit "flight attendants a further opportunity to vote and/or to change their votes if they so desire." (*Id.*) On the morning of April 15, 2003, before the results of the vote were known, and before the above-referenced resolution was issued, AA agreed with APFA representatives to extend the deadline for APFA's ratification referendum until 5:00 p.m. the following day. Before notice of AA's agreement to an extension could be made known to the Board, the vote concluded on April 15, 2003 and it was reported. By a narrow margin, the vote rejected the Restructuring Agreement, an action which was likely to precipitate the bankruptcy of

the Airline. That afternoon, the APFA Board of Directors voted to accept the extension of the deadline. Ms. Cooper was allowed to vote on that issue, but she was precluded from the bulk of the discussions that led up to the vote because of this pending litigation. The April 16 vote resulted in ratification of the Agreement.

Following the ratification, American disclosed that in October of 2002, it had provided forty-five of its senior executives with a bankruptcy-protected supplemental retirement fund and seven top executives with retention awards. As a result of this disclosure, the APFA Board adopted a resolution on April 22, 2003, which stated that the "ratification balloting process [had] been tainted and disturbed by the Company's action" and provided for a "new, expedited ratification vote" to give the APFA membership the opportunity to cast new ballots. (Ward Decl., Ex. B.) Three days later, on April 25, 2003, the APFA Board changed its decision to allow the membership to vote again on the agreement in a resolution which stated that "with great reluctance and under the circumstances presented[, the Board] withdraws the direction to the National Balloting Committee to proceed to arrange for another ratification vote." (Id.) Believing that without an agreement AA would be forced into bankruptcy, resulting in the grounding of approximately 85 to 90 aircraft and the furloughing of approximately 2,500 flight attendants more than the number that would be furloughed under the concession agreement, the Board then voted to authorize "the APFA President to sign the April 25, 2003 letter of agreement between AA and APFA." (Id.) Ms. Cooper was excluded from the full discussion of both the April 22 and April 25 resolutions, but she was allowed to express her opinion and to vote.

On April 29, 2003, AA mailed furlough notices to the approximately 5,000 flight attendants. Pursuant to Article 16(B)(1) of the collective bargaining agreement ("CBA") between AA and APFA, furloughs are implemented strictly on a system–wide occupational seniority basis. (Declaration of Lorraine Mase–Hecker dated June 3, 2003 ("Mase–Hecker June Decl.").) These notices were of two different types. The furlough notice sent to the approximately 1,800 former TWA flight attendants informed them that they were not eligible to proffer for the Overage Leave and Partnership Flying options. The furlough notice sent to the approximately 3,200 flight attendants who had always been with AA informed them that they were eligible for these options. AA's decision to send two different notices was warranted, as there was no reasonable possibility that the former TWA flight attendants would have been eligible for the Overage Leave and Partnership Flying options based on their seniority.

It was ultimately determined that 3,123 flight attendants would need to be furloughed, effective July 2, 2003. These furloughs represent all 1,778 former TWA flight attendants and 1,345 of the next-most junior AA flight attendants. Seventy percent of the furloughs are attributed to the efficiencies accomplished in the Restructuring Agreement while approximately thirty percent are attributed to unrelated schedule reductions. Of the 1,778 furloughs of former TWA flight attendants, approximately 900 to 1,000 are the result of schedule reductions. (Id.)

Other employees of AA have also faced significant furloughs. As a result of both schedule reductions and efficiencies from restructuring agreements with the Allied Pilots Association ("APA") and the Transportation Workers Union ("TWU"), 2,200

pilots and 2,500 ground workers will also be furloughed as of July 2003. (*Id.*)

If AA were prevented from implementing the scheduled July 2, 2003 furloughs, a process which has already commenced, it would be at serious risk of bankruptcy. Failure to implement the APFA Restructuring Agreement could also jeopardize the APA and TWU Restructuring Agreements. If AA is forced into bankruptcy, it is highly likely that many more employees, including flight attendants, pilots, and ground crew personnel, will be furloughed than those presently scheduled.

In its Section 1113 proposal to the Bankruptcy Court, AA estimated that declaring bankruptcy would force it to undertake $470 million in cutbacks related to flight attendants, as opposed to the $340 million in concessions resulting from the Restructuring Agreement. Further, AA would be forced to ground approximately 85 to 90 aircraft, including the entire fleet of 34 wide body A–300 Airbus aircraft, and to furlough approximately 2,500 flight attendants over and above the number that would be furloughed under the Restructuring Agreement. Grounding the fleet would also result in the need to furlough greater numbers of pilots, mechanics, and crew.

## CONCLUSIONS OF LAW

### I. *Standard*

█ In order for the Court to issue a preliminary injunction, the party seeking such relief must show: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

### A. *Irreparable harm*

█ It is well-settled that "the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that, if not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985). If this requirement is not met, no preliminary relief is available. Irreparable harm is defined as an injury for which a monetary award cannot be adequate compensation. *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990).

█ Here, the harm faced by plaintiffs' class is the loss of their jobs for an undetermined period of time as a result of being furloughed. The Supreme Court has held that loss of employment does not, in and of itself, constitute irreparable injury. *Sampson v. Murray,* 415 U.S. 61, 90–91, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). In a footnote, the *Sampson* Court left open the possibility that loss of employment, in extraordinary situations, might constitute irreparable harm justifying preliminary relief:

We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But

we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.

*Id.* at 92 n. 68, 94 S.Ct. 937.

The Second Circuit has had occasion in at least two cases to reiterate the principle articulated in *Sampson* that loss of a position, even in cases where a plaintiff cannot find other employment and suffers financial distress, does not constitute harm sufficient to warrant preliminary relief in the absence of other truly extraordinary circumstances. *See, e.g., Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988) (providing that "[s]ince reinstatement and money damages could make appellees whole from any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief"); *Holt v. Cont'l Group, Inc.,* 708 F.2d 87, 90–91 (2d Cir.1983) (stating that "the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown").

In this case, to support the contention that plaintiffs will suffer irreparable harm, plaintiffs have submitted a binder containing over three hundred e-mails from the former TWA flight attendants who are scheduled for furlough by AA on July 2, 2003. These e-mails were submitted in response to a request by plaintiff Cooper to have the flight attendants detail the hardships they would face from furlough.

The responses set forth a constellation of problems occasioned by the furloughs. Many who responded are women in the their fifties, some with either health problems themselves or family members with health problems. A not insignificant number are single mothers with high school or college-age children, mortgages, and car payments. Some fear loss of their homes and the inability to pay the costs of higher education for their children. A few go so far as to opine that they will face bankruptcy. Most are concerned about the high cost of health care. AA will pay medical benefits for only a month after the furlough takes effect. Thereafter, plaintiffs have the right, pursuant to the provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") 29 U.S.C. § 1161, *et seq.,* to continue group rate coverage under the health benefit plan for an additional seventeen months. The cost to continue coverage, however, is significantly more expensive than the contributions they were required to make as employees.

The Court initially observes that the force of this showing is undermined by plaintiffs' failure to identify which individuals are being furloughed because of the Restructuring Agreement and which are being furloughed as a result of a recent reduction of service. AA estimates that between 900 to 1,000 of the 1,778 former TWA flight attendants scheduled for furlough are being furloughed based upon this reduction in service. Thus, it is likely that the harm to at least a portion of the responding flight attendants is not causally related to the actions complained of in this lawsuit.

This uncertainty does not mean that the responses should be ignored. The Court recognizes that it is likely that at least a significant number of the 341 flight attendants who submitted e-mail responses are being furloughed as a result of the Restructuring Agreement, and the Court is extremely sympathetic to the plight of the many hard-working women and men who are affected by the furlough. Nothing could be more disheartening at the midpoint of one's life than to be confronted with the prospect of an uncertain future. But the Court is called upon to apply the stringent tests that govern the applicabili-

ty of the remedy of a preliminary injunction. The problems articulated, while no doubt real, do not present the "extraordinary" case, at least as this Court understands that term to have been used in *Sampson*. Without in any way seeking to demean the financial hardships many class members will face, this Court concludes that the showing made by plaintiffs falls short of establishing irreparable harm. To employ the language of *Sampson*, plaintiffs point principally to "external factors common to most discharged employees" and not to "unusual actions relating to the discharge itself." *Sampson*, 415 U.S. at 92 n. 68, 94 S.Ct. 937.

As recognized in *Sampson*, it is possible that the consequences of job loss could rise to the level of irreparable harm. Consistent with *Sampson*'s statement that the situation would have to be extraordinary, at least one court has suggested that a plaintiff would have to show little or no chance of securing future employment, no personal or family resources, and the inability to finance a loan or obtain public assistance. *Pinckney v. Bd. Of Educ. of Westbury Union Free Sch. Dist.*, 920 F.Supp. 393, 401 (E.D.N.Y.1996). That showing has not been persuasively made in this case. The furloughed flight attendants will have at least some financial protection in the form of unemployment benefits. Moreover, although it is unlikely that they will find other employment in the airline industry, there is no convincing showing that the majority of the affected flight attendants would be unable to secure some other form of employment or, if they cannot, that there are no other avenues available to them to secure financial assistance.

█ Plaintiffs cite two cases for the proposition that loss of medical benefits can constitute irreparable harm: *Communications Workers of Am., Dist. One, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887

(2d Cir.1990) and *Whelan v. Colgan*, 602 F.2d 1060 (2d Cir.1979). However, because the plaintiffs in this case will retain for a period of time their ability to secure medical coverage under COBRA, these cases can be distinguished. *NYNEX* involved the denial of COBRA benefits as required under federal law, and *Whelan* was a pre-COBRA case in which the very action being challenged was the union's decision to cut off medical and welfare benefits to striking workers.

Plaintiffs point to no case which suggests that the *Sampson* analysis necessarily should be different because the action affects numerous employees as distinguished from one. The one case cited from the Second Circuit for the proposition that mass layoffs justify preliminary relief does not support that contention. *See Local 553 Transp. Workers Union of Am., AFL–CIO*, 695 F.2d 668, 678 (2d Cir.1983). In *Local 553*, the Second Circuit upheld the issuance of a preliminary injunction where it was not possible to determine the identity of the flight attendants who would be the ones to suffer loss of wages as a result of the challenged airline action. *See id.* What justified the injunction was not the number of employees affected, but, rather, the inability to determine which employees would be affected for the purpose of assessing any future award of damages. The court in *Local 553*, which in citing *Sampson* had affirmed its applicability to actions impacting numerous individuals, was careful to note the limits of its decision upholding the issuance of an injunction: "[In] the more typical labor disputes in which a company has eliminated a number of positions, there is no similar irreparable harm to justify a preliminary injunction because the financial injury will fall directly on an easily ascertainable group of employees—the most junior members." *Id.* at 678. That is precisely

the situation that exists in the instant case. The flight attendants subject to furlough are easily ascertainable.

Plaintiffs do point to cases where courts have enjoined layoffs in unique circumstances where it would have been impossible to put the plaintiffs back in the same position if they ultimately prevailed. (As one court colorfully describes it—in circumstances where the eggs cannot be "unscrambled." *Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines, Inc.,* 601 F.Supp. 1363, 1372 (W.D.Mo.1985)). The cases cited, however, can be distinguished. The plaintiffs here will not be terminated, but rather furloughed in circumstances where they retain their seniority for five years. If they were to prevail, there is nothing to suggest that the jobs they seek have been irrevocably been lost as in *Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp.,* 668 F.2d 276, 286 (7th Cir.1981). In that case, what was at issue in a union arbitration was a sale of a division which, if not enjoined, would have resulted in the loss of jobs that could never have been recouped. *See id.* at 286; *see also, Bakery Drivers Union, Local 802 v. S.B. Thomas, Inc.,* No. 78–C 1270, 1978 WL 1654, at *5 (E.D.N.Y. June 21, 1978) (finding that absent an injunction, the plaintiffs would suffer irreparable harm because jobs would be permanently lost given the competitive nature of the bakery industry).

■ ■ The Court makes one final observation. Even if plaintiffs were able to supplement the showing on irreparable harm and document that a few members of the potential class had personal circumstances so extreme as to be found extraordinary, that showing alone would not justify the class-wide injunction sought here. Plaintiffs seek to enjoin implementation of the Restructuring Agreement which they say will result in the furloughing of 1800 class members. Although plaintiffs are not required to show that every single member of the class will face irreparable harm, neither is it sufficient to show that such harms might be experienced by a very few. One cannot infer from the fact that a few members with unique problems might be able to meet the standard that the impact is class wide. As one court concluded: "In the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction." *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 487 (3d Cir.2000).

## B. *Likelihood of Success on the Merits*

Even if plaintiffs were able to establish irreparable harm, the Court concludes that they would not be able to meet the second required showing necessary to obtain injunctive relief; namely, either a likelihood of success on the merits or both a fair ground for litigation and the balance of hardships tipping in their favor.

At issue is the likelihood of success on the merits of three claims which form the predicate for plaintiffs' request for injunctive relief. The first of these is the claim arising under federal law that the union, as the exclusive bargaining representative for the flight attendants, breached its duty of fair representation (Claim 10). Plaintiffs also bring two common law claims, apparently pursuant to this Court's supplemental jurisdiction, that AA aided and abetted this breach (Claim 11), and that AA engaged in fraud when AA and CEO Carty, intentionally and with intent to deceive, failed to disclose during the negotiation and ratification process material information concerning executive retention benefits (Claim 12). The Court will consider these claims in turn.

### 1. *Breach of Duty of Fair Representation*

Plaintiffs argue that APFA breached its duty of fair representation ("DFR") by its conduct in negotiating and accepting labor concessions in response to AA's threatened bankruptcy. Specifically, plaintiffs allege in their Supplemental Complaint that APFA acted in bad faith and with discriminatory intent during the March 2003 negotiations over concessions demanded by American. Plaintiffs claim that APFA purposely selected and agreed to concessions that disproportionately and unjustly resulted in the loss of jobs without severance pay for all of the remaining former TWA flight attendants with no proportionate loss of jobs to the original AA flight attendants. As further breaches of the duty of fair representation, plaintiffs point to what they contend was APFA's collusion with AA to reject the April 15 "no" vote of the membership and allow a revote. In addition, plaintiffs cite APFA's alleged violation of its own constitution by its April 25, 2003 action to withdraw its April 22, 2003 resolution calling for a new vote and, instead, to accept a Restructuring Agreement with enhancements without submitting the agreement to a vote of the membership.

A union certified as the exclusive bargaining agent under the RLA has a statutory obligation to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). This duty extends to the negotiation of a collective bargaining agreement, as well as to its enforcement and administration. *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Spellacy v. Airline Pilots Ass'n–Int'l,* 156

F.3d 120, 126 (2d Cir.1998) (relying on *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) and *Vaca,* 386 U.S. at 177, 87 S.Ct. 903).

A union breaches its duty of fair representation if its actions are so far outside a range of reasonableness as to be wholly "arbitrary, discriminatory, or in bad faith." *Sim v. New York Mailers' Union Number 6,* 166 F.3d 465, 472 (1999) (quoting *Spellacy,* 156 F.3d at 126, in turn quoting *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127.) A union acts in bad faith when it acts with an improper intent, purpose, or motive. *Spellacy,* 156 F.3d at 126. Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct. *Id.* (internal citations omitted).

A union also violates its duty of fair representation when it engages in discrimination that is invidious. *See O'Neill,* 499 U.S. at 81, 111 S.Ct. 1127; *Considine v. Newspaper Agency Corp.,* 43 F.3d 1349, 1357 (10th Cir.1994). Discrimination is invidious if it is based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus. *Considine,* 43 F.3d at 1359–60 (internal citations omitted). By contrast, classifications according to seniority and skill level or other employment-related criteria of union members are relevant, rational, and often inevitable. *Considine,* 43 F.3d at 1360 (citing *Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944)).

Plaintiffs fail to show a likelihood of success on the merits on their claim that APFA breached its duty because it negotiated in bad faith and with discriminatory intent. As the case law makes plain, the fact that an action taken by a union may have the result of benefitting one group over another, standing

alone, does not constitute a breach of the duty of fair representation. *See Ford Motor Co.*, 345 U.S. at 338, 73 S.Ct. 681; *see also Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221 (2d Cir.1989) (stating that the duty of fair representation does not require that a union achieve equality among its members and that a showing that a union action has disadvantaged a group of members, without more, fails to establish a breach of the duty of fair representation); *Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 457 (2d Cir.1979) (finding no breach of the duty of fair representation where, in an effort to make the best out of a bad situation, the union's "drawing of a line" inevitably hurts someone); *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir.1961) (recognizing that "a bargain which favors one class of employees over another is not necessarily prohibited as a hostile discrimination"). Rather, a potentially dissatisfied group is an inevitable result of the democratic process unions invoke to reach collective agreements. *See Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1532 (7th Cir.1992).

Implicit in the context of labor negotiations, or in any negotiation for that matter, is the notion that some groups will "win" while other groups will "lose," a notion that the Supreme Court recognized nearly fifty years ago in *Ford Motor Co.*:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

345 U.S. at 338, 73 S.Ct. 681.

Although plaintiffs opt to couch their case as one of "discrimination, pure and simple," the hearing evidence did not persuasively support a claim of bad faith, animus, or intentional discrimination directed at the former TWA flight attendants by the union. Instead, the former TWA flight attendants' problems arise principally as a result of their position on the seniority list. Whether they should have been placed at the end of that list, however, is not an issue before the Court on the present motion.

As evidence of the alleged ill-will towards former TWA flight attendants, Ms. Cooper points to several comments, but these comments either were not made by APFA management or were equivocal in the context in which they were made. She first points to the use of the term "furlough cushion" as applied to the former TWA flight attendants. This phrase, if used by the union leadership to refer to the former TWA group, may have some evidentiary value in that one could argue it conveys a callous disregard for their circumstances. Yet, there is no evidence that the phrase was used by anyone other than AA flight attendants. Ms. Cooper does not contend that any of the APFA leadership or anyone at AA used it, and the hearing witnesses from APFA and AA deny having used that term.

Ms. Cooper, as further evidence of ill-will, points to Mr. Ward's references to the former TWA flight attendants as "you people" during an emotionally charged labor meeting unrelated to the circumstances of the current dispute and to his comments about Ms. Cooper's having only been present at AA for an hour and a half. When considered in the context in which they were made, though, these comments are

extremely weak evidence, if evidence at all, of either bad faith or discriminatory animus. At best, they are analogous to the type of "stray remarks" referred to in Title VII cases, which are considered of little evidentiary import in proving discrimination. *See, e.g., Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001); *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998).

No evidence was presented at the hearing that during the negotiations the former TWA flight attendants as a group were singled out as a topic of discussion. Neither Ms. Glading of APFA nor Ms. Mase–Hecker of AA, both participants in the negotiations, recall that this topic arose. Similarly, there is no evidence that any such discussions took place in the meetings from which Ms. Cooper was excluded. John Nikides, an APFA Board member who strongly shares Ms. Cooper's view that the April 15 extension of the vote and the April 25 agreement to the enhanced Restructuring Agreement were not proper, denies that there was any discussion that singled out the former TWA flight attendants in the portions of the meetings from which Ms. Cooper was excluded on April 15, 22, and 25.

Ms. Cooper also points to her exclusion from these meetings as evidence of an intent to exclude the former TWA flight attendants from the voting and ratification process. Again, as proof of either bad faith, animus, or discriminatory intent, this evidence is not compelling. As a Board member, Ms. Cooper was privy to the concessions AA was seeking in early March and was permitted to express her views. She was given the concessions sheet once an agreement was reached on March 31, 2003. Her input as to what were appropriate or inappropriate concessions appears to have been no more restricted than any other Board member who was not a member of the Negotiating Committee. Although John Ward said he did speak informally to other Board members about the negotiations, there is no evidence that he refused to speak with Ms. Cooper or that some specific inquiry of hers was ignored.

Her exclusion from the meetings of April 15, 22, and 25 occurred after the concessions about which she complained were decided. Although her exclusion from major portions of these meetings appears to have been overly restrictive, she was allowed to express her views and to vote. At least based on the evidence available to date, there is nothing to suggest that her exclusion was for any other reason than the stated one; namely, APFA's concern that it would waive the attorney-client privilege if a discussion with APFA counsel commenced in her presence regarding the legality of potential Board action.

The heart of plaintiffs' claim of discrimination, bad faith, and arbitrary action rests in their view of the choices APFA made to meet AA's demand for concessions. According to plaintiffs, APFA showed little or no concern for the loss of jobs while negotiating these concessions. As they see it, APFA's cavalier attitude about head count reduction was premised on its recognition that the burden of these reductions would fall on the disfavored former TWA flight attendants. The inference they seek to draw is not compelling. Although plaintiff Cooper points to other ways in which money could have been saved without a head count reduction, the choices ultimately made were not so plainly arbitrary as to support a likelihood of success on the merits of a claim that APFA breached its duty of fair representation in negotiating these concessions.

 A union's actions are arbitrary only if, "in light of the factual and legal

landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (quoting *Ford Motor Co.,* 345 U.S. at 338, 73 S.Ct. 681). As Mr. Ward explained, in discussing, for example, the decision not to change sick pay rules, protecting rights secured in a contract is a goal which often competes with the concern over saving jobs. His reasoning for rejecting AA's proposal for a change in health care benefits also was credible. Moreover, it bears noting that the ultimate head count reduction was less than that resulting from the initial approach put before APFA by AA in early March. (*See* Pls.' Ex. 1.)

The one concession plaintiffs cite to that is admittedly troubling was the decision to sacrifice the entire severance pay of furloughed flight attendants in order to reach the $340 million goal. Mr. Ward contended that this was a last minute determination made in a desperate effort to reach the $340 million figure. He explained that it was never considered earlier because, until he saw AA's proposed Section 1113 filing, he never realized that AA assigned it a value. Understandably, plaintiffs, as the group bearing the brunt of the head count reduction, were particularly angry about this concession. It was a concession, however, that Ward had to know would, and did, impact not only the former TWA flight attendants who stood to be furloughed as a result of the Restructuring Agreement, but also the AA flight attendants who faced furlough as a result of what everyone expected at the time would be additional layoffs due to a reduction in service. The broader impact of the concession, coupled with the hectic nature of the last-minute negotiations to reach the $340 million figure, undermines the strength of any inference that it was a decision made arbitrarily or with animus or ill-will towards the former TWA group.

■ In sum, plaintiffs have failed to show a likelihood of success on the merits of their claim that in reaching concessions with AA, APFA breached its duty of fair representation. There is little, if any, evidence of animus, ill-will, or bad faith. As the case law makes plain, the duty is not breached simply by an action which is more favorable to one group than to another, and mere knowledge of the fact that one group may gain and another lose is not proof of a discriminatory motive. *Rakestraw,* 981 F.2d at 1532. Moreover, the concessions reached do not appear to have been arbitrary. The Court questions whether plaintiffs have even raised a fair ground for litigation on this claim. In any event, as discussed, *infra,* they have failed to establish that the balance of hardships tips in their favor.

■ Plaintiffs also claim that APFA breached its duty of fair representation when it allegedly colluded with AA to reject the April 15 vote of the membership and to permit both an extension of time to vote, as well as the option for a flight attendant to change his or her vote. Once again, this Court finds the evidence of any collusion wanting. At the evidentiary hearing, Ward's uncontradicted testimony established that AA agreed to extend the voting for a day *before* AA learned the results of the April 15 vote. APFA had been pressing AA all along for additional balloting time because of a variety of problems, problems which had existed and were voiced before APFA too learned the results of the April 15 vote. These problems included the fact that the full terms of the finalized Restructuring Agreement were not put before the membership until hours before the end of the balloting period and that flight attendants had encountered problems with the voting process.

Plaintiffs have demonstrated that agreeing to extend the time to vote was controversial, but they have failed to persuade the Court that they are likely to succeed on the merits of a claim that such action was so far outside a "wide range of reasonableness" as to be wholly irrational or arbitrary. *See O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127.

■■■ Finally, the Court turns to plaintiffs' claim that APFA breached its duty of fair representation by adopting its April 25, 2003 resolution in violation of its constitution. APFA's April 25 resolution revoked its earlier resolution of April 22, 2003, which had called for a new vote on the Restructuring Agreement. The April 25 resolution also approved, without seeking ratification by its membership, a Restructuring Agreement containing terms in addition to those approved by the membership in the April 16 vote. Plaintiffs claim this action was a blatant violation of the APFA constitution.

Consistent with what the Court would note was the "fluid" nature of these proceedings, the Court, and apparently the defendants, had not understood APFA's April 25, 2003 resolution to be the subject of plaintiffs' claim for breach of the duty of fair representation as set forth in Claim 10 of the Supplemental Complaint. However, because plaintiffs incorporated by reference all eighty-two paragraphs that preceded Claim 10, including paragraph fifty-four, which describes APFA's April 25, 2003 action as a "breach of its fiduciary duty and in violation of its own constitution," this Court concludes that plaintiffs have sufficiently alleged this theory.

■■■ As previously noted, a union breaches its duty of fair representation if its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith. *Spellacy,* 156 F.3d at

126 (quoting *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127). Judicial review of union action must be highly deferential in recognition of the wide latitude that unions need to effectively perform their bargaining responsibilities. *Id.* (quoting *Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1106 (2d Cir.1991)). This high level of judicial deference also extends to a union's interpretation of its own constitution, to which the Court will defer unless that interpretation is "patently unreasonable." *Sim v. New York Mailer's Union Number 6,* 166 F.3d 465, 470 (2d Cir.1999).

Plaintiffs have raised a substantial argument that APFA's conduct did, in fact, violate its own constitution, especially in light of various constitutional provisions which suggest that membership ratification of a negotiated agreement often is required. *See, e.g.,* APFA Constitution, Article XI, part A (a proposed CBA *will be* submitted to the affected membership for approval only after it has been accepted by a majority vote of the Negotiating Committee and presented to the Executive Committee), part C (the affected membership *shall be* given the complete changes to the CBA prior to or at the start of the balloting period), part D (a proposed CBA *shall be* ratified by an affirmative vote by a majority of those active members in good standing covered by the applicable Agreement who return valid ballots) (emphasis added).

Although not explicitly argued in their memorandum of law, plaintiffs raised at oral argument, and notably at the conclusion of the hearing on their claim, the argument that APFA's alleged constitutional violation establishes a *per se* breach of its duty of fair representation. However, plaintiffs have not provided the Court with any authority to support this broad proposition. Undoubtedly, the circumstances in which APFA found itself were,

as the language of the April 25 resolution reflects, dire. The evidence illustrates that APFA's choice was either to accept without membership ratification a Restructuring Agreement which had previously been approved and which now contained additions that were beneficial to APFA's membership or to face the almost certain result that AA would file for bankruptcy and leave, not only APFA's membership in a worse position, but also jeopardize the agreements of the other two unions. APFA, thus, as one case describes it, was forced to navigate between Scylla and Charybdis. *Famulare v. United Transp. Union Int'l*, 639 F.Supp. 965, 968 (S.D.N.Y.1986).

Although the strength of the argument that APFA breached its own constitution may give rise to fair grounds for litigation as to plaintiffs' breach of the duty of fair representation claim, the surrounding circumstances and wide discretion accorded a union in APFA's position suggest that plaintiffs cannot show a likelihood of success on the merits. Furthermore, despite this potential fair ground for litigation, no preliminary relief is warranted because the balance of the hardships in this case, as discussed *infra*, does not tip in plaintiffs' favor.

### 2. *Aiding and Abetting*

Plaintiff's eleventh claim alleges that AA aided and abetted APFA's breach of its fiduciary duty. In particular, plaintiffs state as the factual predicate for their aiding and abetting claim AA's actions in "accepting and encouraging the acceptance of the Restructuring Agreement," "colluding with APFA to reject the April 15th [vote]," "creating an opportunity for APFA to conduct a second vote," and "inducing APFA to accept and adopt the enhanced Restructuring Agreement without membership vote." (Supp. Compl. at ¶ 96.)

As an initial matter, the Court notes that, as discussed *supra*, because plaintiffs do not meet the requirements for an injunction for their breach of the duty of fair representation claim, this discussion of aiding and abetting the alleged breach is somewhat academic. Nonetheless, the Court finds that plaintiffs cannot establish either a likelihood of success on the merits or a fair ground for litigation on their aiding and abetting claim against AA because this claim is preempted under the doctrine set forth in *San Diego Bldg., Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), otherwise referred to as "*Garmon* preemption."

*Garmon* preemption first arose in the context of the National Labor Relations Act ("NLRA") and provides that state regulations and causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by federal labor law. *Id.* at 245, 79 S.Ct. 773; *see also Belknap v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983). There are two exceptions to the *Garmon* doctrine. A state cause of action can be sustained if the behavior to be regulated is behavior that is of only "peripheral concern" to federal law or touches interests deeply rooted in local feeling and responsibility. *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773; *Belknap*, 463 U.S. at 498, 103 S.Ct. 3172. Since its inception, *Garmon* preemption has been extended to and applied in the context of the RLA. *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *see also Kaufman v. Allied Pilots Ass'n*, 274 F.3d 197, 200 n. 5 (2001). And, as one court has observed, preemption of state law claims has been even "more complete" under the RLA than under the NLRA. *Peterson v. Air Line*

*Pilots Ass'n Int'l,* 759 F.2d 1161, 1169 (4th Cir.1985) (citing cases).

From this Court's perspective, plaintiffs' aiding and abetting claim is indistinguishable from a hybrid claim against APFA and AA for breach of the duty of fair representation under the RLA. *See Czosek v. O'Mara,* 397 U.S. 25, 29, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970). As a result, plaintiffs' state law aiding and abetting claim is preempted under *Garmon* because it represents conduct that is the clear subject of federal labor law; namely, it is virtually identical to a federal cause of action for breach of the duty of fair representation. *See Peterson,* 759 F.2d at 1170 (deeming preempted plaintiff's state law claims because they were identical, in both substance and relief, to his federal claim for breach of the duty of fair representation).

As noted earlier, even if this Court were to construe plaintiffs' aiding and abetting claim as a hybrid action for breach of the duty of fair representation claim, plaintiffs would still fail to prevail in light of this Court's previous rulings.

### 3. *Fraud*

█ The parties disagree about whether a state cause of action for fraud is preempted by the RLA. Consistent with what the Court has described as the fluid nature of these proceedings, defendant AA only clearly stated at oral argument its position that this claim too was subject to *Garmon* preemption. This position appears to be correct.

As the Supreme Court has stated:

The heart of the Railway Labor Act is the duty, imposed by [§ ] 2 First upon management and labor, "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

*Bhd. of R.R. Trainmen,* 394 U.S. at 377–78, 89 S.Ct. 1109 (quoting § 2 First of the RLA, which is codified as 45 U.S.C. § 152).

█ Implicit in the RLA's requirement that the parties take "every reasonable effort," to reach agreements concerning rates of pay, rules, and working conditions is the requirement that the parties bargain in good faith. *See Chi. & N.W. Ry. Co. v. United Transp. Union,* 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (stating that the Court had no occasion to determine at that time whether § 2 First of the RLA requires more than "avoidance of 'bad faith' "); *Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos,* 924 F.2d 1005, 1008 (11th Cir.1991) (calling "essential" to the RLA's statutory scheme the duty to bargain in good faith codified in § 2 First); *United Air Lines Inc. v. Airline Div., Int'l Bhd. of Teamsters,* 874 F.2d 110, 114 n. 5 (2d Cir.1989) (recognizing that the Supreme Court may have limited injunctive relief under § 2 First of the RLA to cases where the parties have bargained in bad faith); *Am. Ry. & Airway Supervisors Assoc. v. Soo Line R.R. Co.,* 891 F.2d 675, 678 (8th Cir.1989) (noting that the RLA's "exert every reasonable effort" language imposes upon the railroad an affirmative duty to negotiate in good faith with the unions); *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Ry. Labor Conference,* 310 F.Supp. 905, 912–913 (D.D.C.1970) (recognizing that § 2 First imposes a duty to bargain in good faith).

The fraudulent conduct charged by plaintiffs constitutes an allegation of bad faith bargaining on the part of Carty and AA. However, such an allegation clearly

involves conduct that is actually, and at the very least arguably, covered by the RLA. *Cf. Parker v. Connors Steel Co.*, 855 F.2d 1510, 1516–17 (11th Cir.1988) (deeming plaintiff's state law fraud claims preempted under *Garmon* because plaintiff's allegations that his employer made material misrepresentations during negotiations implicated the NLRA's statutory obligation to bargain in good faith); *Kolentus v. Avco Corp.*, 798 F.2d 949, 961 (7th Cir.1986) (finding plaintiff's state law fraud claim preempted under *Garmon* because plaintiff's claim of misrepresentation during negotiations constituted an unfair labor practice under the NLRA). As one court has stated in the context of the NLRA, "[i]nsuring that employers and employees bargain with each other in good faith is of central importance under the Act." *Kolentus*, 798 F.2d at 961. Under the RLA, good faith bargaining by all parties certainly is no less important. Nor can it be said, given the central importance of good faith bargaining, that the fraudulent conduct alleged is of "peripheral concern." *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773.

As a result, the Court finds that plaintiffs cannot show a likelihood of success on the merits of their state law fraud claim because it is preempted under *Garmon*. Moreover, the Court notes that even if plaintiffs' fraud claim against AA were not preempted, plaintiffs likely would not prevail on the merits, or even establish a fair ground for litigation, on this claim in light of the uncontested fact that APFA approved the Restructuring Agreement with knowledge of the alleged fraud and after having secured additional concessions from AA in exchange for its approval.

### C. *Balance of Hardships*

 Assuming that any of the plaintiffs' claims provides a "fair ground for litigation," the Court finds that prelimi-nary relief still is not warranted because the balance of the hardships does not tip in favor of the plaintiffs.

Plaintiffs have presented evidence that a significant number of the furloughed former TWA flight attendants will face serious financial hardship from the loss of their position. For its part, AA, which has already expended significant funds to implement the Restructuring Agreement, alleges that a highly probable result of an injunction prohibiting implementation of the Agreement will be to force it to declare bankruptcy. Plaintiffs do not seriously dispute that this is a predictable consequence of this injunction. Indeed, Ms. Cooper has suggested that the former TWA flight attendants might fare better in bankruptcy. What is clear, however, is that no one else would benefit from such an event, certainly not the currently employed flight attendants, the other employees of AA, the company, its shareholders, the economy, or the traveling public.

Such an event would have dramatically adverse consequences for AA's employees. In its Section 1113 proposal prepared for the Bankruptcy Court, AA estimated that declaring bankruptcy would force it to undertake an estimated $470 million in cutbacks for the flight attendants alone (as opposed to the $340 million in concessions to avoid bankruptcy). Further, AA would be forced to ground approximately 85 to 90 aircraft, including the entire fleet of 34 wide body A–300 Airbus aircraft, and to furlough approximately 2,500 flight attendants over and above the number that would be furloughed under the Restructuring Agreement. Grounding the fleet would also result in the need to furlough greater numbers of pilots, mechanics, and crews. Thus, if bankruptcy ensues, many more employees face furlough or termination, and plaintiffs will be in no appreciably better situation than they are in now.

Accordingly, the Court concludes that the balance of hardships does not weigh in plaintiffs' favor.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' request for a preliminary injunction is denied.

SO ORDERED.